Ezzetta D. McMULLEN et al.

v.

David C. DOWLEY and Jane Dowley.

Supreme Judicial Court of Maine.

Argued April 30, 1980.

Decided Sept. 5, 1980.

Alan D. Graves, Machias (orally), for plaintiffs.

Francis J. Hallissey, Machias (orally), for defendants.

Before McKUSICK, C. J., and WERNICK, GODFREY, GLASSMAN and ROBERTS, JJ.

GODFREY, Justice.

Appellees McMullen, Bagley, and Grant began this action against the Dowleys to quiet title to a parcel of woodland in Roque Bluffs, Maine. The Dowleys, appellants here, counterclaimed, seeking an adjudication that they and their predecessors had established title through adverse possession under 14 M.R.S.A. §§ 801, 815, or 816 (1980). As a result of a stipulation of the parties, the matter was tried without a jury as a declaratory judgment action in Superior Court, Washington County. The presiding justice rendered judgment adjudging title to be in the appellees and dismissing the Dowleys' counterclaim. On appeal, the Dowleys assert, in effect, that the trial justice reached an erroneous result because, in determining whether the conduct of the Dowleys' predecessors in relation to the land amounted to adverse possession, he applied certain general criteria without giv-

ing sufficient weight to specific facts clearly established by the evidence. We vacate the judgment and remand for reconsideration on the basis of the existing record in the light of this opinion.

To the extent relevant, the history of the title is as follows: In April, 1897, Josiah Watts conveyed in one deed to Philander A. Davis two adjacent parcels once forming a single parcel formerly known as the "southerly half of the Fickett lot." The land conveyed was described as follows:

Beginning on the northeasterly side of the road leading to Jonesboro, at the northerly line of land heretofore owned by George W. H. Watts, and running Easterly by said northerly line to lot numbered twenty–five (25) on plan of Englishman's River Neck; thence northerly, by line of last named lot, thirty one rods; thence westerly, by the parcel of land hereinafter described, to said road; thence southerly, by said road to place of beginning. Said described premises contain sixty acres, more or less, and were conveyed to me by Joel T. Wilson et al. by deed dated March 20, A.D. 1897, to which deed or record thereof reference may be had. Also one other lot or parcel of wild land situated in said Roque Bluffs and bounded northeasterly by said lot numbered twenty–five (25), southeasterly by the land above described, southwesterly by the said road leading to Jonesboro, and northwesterly by land heretofore of Elizabeth Tuttle, and now owned or occupied by Martin Van Buren Smith. Said described premises were conveyed to me by Sarah M. Francis by deed dated March 17, A.D. 1897, to which deed or record thereof reference may be had. Both of said described parcels are part of lot numbered twenty–seven (27) upon plan aforesaid.

At issue is title to the second lot described above, hereinafter referred to as the "northern lot". The common boundary of the two lots, presumably described by either the third boundary call of the first–described (southern) lot or the second call of the second–described (northern) lot, cannot be ascertained from the quoted description without resort to one or both of the earlier, March, 1897, conveyances to Watts by Joel Wilson and Sarah Francis, neither of which conveyances is in evidence in this case. Merely from the face of the 1914 deed, it would be impossible to ascertain the boundary line dividing the two lots.

In 1906, Philander Davis having died, his heirs conveyed both lots to his widow, Priscilla Davis, who in turn conveyed them to her son, Herman Davis, by deed dated May 29, 1912. In 1914, although Priscilla Davis had already transferred both parts of the Watts lot to Herman, she joined with him in a conveyance to Lowell Smith by a general warranty deed with the following description:

[a] certain lot or parcel of wild land, situated in said Roque Bluffs and bounded as follows, to wit: Beginning on the Northeasterly side of the road leading to Jonesboro at the Northerly line of land heretofore owned by George W. H. Watts, and running easterly by said Northerly line to lot number twenty–five (25) on plan of Englishmen's River Neck; thence Northerly by line of last named lot, thirty one rods, thence Westerly by the parallel of land hereinafter described, to said road; thence Southerly by said road to place of beginning. Said described premises contain sixty acres more or less and were conveyed to the said late Philander A. Davis by Josiah W. Watts by deed dated April 3, 1897. . . .

Unlike the Watts conveyance to Philander Davis in 1897, this 1914 conveyance contained no description of the northern lot, with the result that the reference in the third boundary call to "the land hereinafter described" is indefinite without ultimate reference to one or both of the March, 1897, deeds to Josiah Watts.

Herman Davis died in February, 1919, leaving a widow, Vivian, and a minor son, Morrill. In March, 1919, Vivian Davis gave a quitclaim deed to Priscilla Davis of any and all her right in any real estate owned by Herman at his death (with an exception not here pertinent). That deed purported

to convey Vivian's interest in three parcels of real estate in Washington County, including, specifically,

> [a] certain lot in said Roque Bluffs, described as follows, The land formerly known as the Watts lot, heretofore owned by Philander Davis, same described in deed of Josiah Watts to said Philander Davis, recorded in book 255, page 364 of the Washington County Registry of Deeds.

The quitclaim deed from Vivian was obviously intended to transfer to Priscilla any rights of dower or succession Vivian had or might have had with respect to lands owned by Herman, Vivian not having joined in the deed of Priscilla and Herman to Lowell Smith in 1914. Although Vivian had sought and apparently obtained a license to sell the real estate of Herman's minor son, Morrill, she does not appear ever to have conveyed to Priscilla the ⅔ interest of the son in whatever rights Herman still had at his death in the Watts lot.[1]

By deed dated June 2, 1919, Priscilla Davis conveyed by warranty deed to Martha Bagley three separate parcels of real estate in Washington County, including

> the lot bounded Northerly by lot 25 in said Roque Bluffs, conveyed by Joseph [sic] W. Watts to said Philanda [sic] Davis by deed dated April 3, 1897, and recorded Book 255, Page 264 [sic], of said registry.

Several of the appellees, as successors of Martha Bagley, base their rights on this conveyance. The description in this deed was a peculiar one for effectuating the result that appellees attribute to it, namely of conveying the northern lot of the former Josiah Watts parcel. The quoted description of the land conveyed was certainly open to the construction that Priscilla was in effect purporting to convey and warrant title to the entire Watts parcel, including both the northern and southern lots, even though five years earlier she had joined her son in conveying at least the southern lot to Lowell Smith and even though she had at most only a ⅓ undivided interest in the northern lot, acquired from Vivian a few months earlier. Nevertheless, the appellees' position is that, through ultimate succession to the interests of Priscilla and Herman Davis, they acquired whatever interests in the Watts parcel Priscilla and Herman did not convey to Lowell Smith in 1914; that is, in their view of matters, the northern lot.

By purchase in 1978, the Dowleys acquired title to at least the southern lot and a conveyance of all interest of the grantors in the northern lot from Raymond Clark and Annie Smith, heir and widow of an heir of Lowell Smith. The grantors testified at trial that they believed they held record title to both the northern and southern lots as heirs of Lowell Smith. However, a title examination and survey conducted in anticipation of the 1978 purchase had disclosed that the deed on which the sellers relied contained no description of the northern lot.

The appellees thus claim the northern lot as the successors of Priscilla and Herman Davis, while the Dowleys claim it as purchasers from the successors of Lowell Smith.

The Superior Court justice found that, as of 1919, record title to the southern lot was in Lowell Smith and record title to the northern lot was in Martha Bagley.[2] Since there was no evidence establishing the location of the boundary between the southern and northern lots, the trial justice did not undertake to define that boundary. The justice declared appellees to be the owners of the northern lot, rejecting the Dowleys' claim under 14 M.R.S.A. § 816 (1980) on the

---

1. From the documents in evidence, it appears that the interest, if any, of Herman's son, Morrill, in the Watts parcel was never conveyed during his lifetime. Morrill died leaving only a widow, Ezzetta McMullen, and his mother, Vivian. In May, 1978, on the eve of the present litigation, Vivian purported to convey to Ezzetta all Vivian's interest in land in Roque Bluffs that Morrill owned at the time he died. Ezzetta thus claims Morrill's ⅔ undivided interest in the northern lot.

2. It seems that in 1919 Morrill Davis, the minor son of Herman Davis, still had a ⅔ interest in whatever rights Herman had in the Watts lot at the time of his death in February of that year.

ground that it was impossible to construe the Davis–Smith deed of 1914 as encompassing the northern lot so as to constitute a "recorded deed" providing the color of title requisite for application of section 816.[3]

■ In rejecting the Dowleys' claim under section 816, the justice was correct. There is no way to read the description in the Davis–Smith deed of 1914, even in a view favorable to the Dowleys of the course of the third boundary call, that will result in their having color of title by deed to the entire northerly part of the former Watts lot. Contrary to a suggestion by the Dowleys, this conclusion cannot be avoided by treating the recital in the 1914 Davis–Smith deed that the area of the lot conveyed was "60 acres, more or less" as somehow showing an intent to convey the entire Watts lot, which comprised over 90 acres.

■ Although the 1978 deed into the Dowleys contained a quitclaim of their transferors' interest in the northern lot, the Dowleys themselves have not been in possession of that lot for twenty years, and their predecessors in interest had not been in possession under deeds that encompassed the northern lot, whatever its southern boundary may be. Hence the Dowleys cannot maintain their claim under section 816. *John Wallingford Fruit House, Inc. v. MacPherson*, Me., 386 A.2d 332, 334 (1978).

■ From the evidence adduced at trial, the presiding justice made some specific findings of fact about the nature and extent of the possession by the Dowleys and their predecessors on which they based their claim of title by common law adverse possession. He found that Lowell Smith "went into possession of" the southern lot in 1914 but that there was no evidence of his pos-

session of the northern lot until the 1920s. He found that in the 1920s the northern lot bordered on land of Sinford, and that general reputation in the community from the 1920s on was that "Smith was bounded by Sinford." Smith was assessed and faithfully paid taxes on the "southerly half of the Fickett Lot" which meant he paid taxes on both the northern and southern lots. Evidence that Smith and his successors paid all the taxes on the northern lot, as well as the southern, was correctly admitted by the trial justice on the ground that, though not probative of possession, such evidence tends to prove claim of title. *Holden v. Page*, 118 Me. 242, 107 A. 492 (1919).

The trial justice also found as follows: Lowell Smith cut wood on the northern lot from time to time beginning in the 1920s, at least until some 10 years before his death in 1944. After about 1934, Lowell's son, Robert, cut wood on the northern lot. Lowell Smith built a camp on the southern lot, and later his grandson, Raymond Clark, built a camp on the same lot. They stayed in the camps when cutting wood. There were two tote roads on the southern lot, and there may have been a tote road on the northern lot.

Reasoning that "ordinarily, by the nature of things, title by adverse possession cannot be acquired to wild lands or wood lots", the presiding justice then concluded that the defendants had totally failed to show adverse possession of the northern lot. He relied on the first resolution in *Stewart v. Small*, 119 Me. 269, 271, 110 A. 683, 684 (1920), in which, he said, "frequent wood cutting, building a camp, frequent fishing and hunting parties fell far short of showing an ouster of the true owner."[4]

---

**3.** Section 816 of 14 M.R.S.A. provides, in pertinent part, as follows:

No . . . action for the recovery of uncultivated lands . . . shall be commenced or maintained against any person, or entry made thereon, when such person or those under whom he claims have, continuously for the 20 years next prior to the commencement of such action or the making of such entry, claimed said lands . . . under recorded deeds; and have, during said 20

years, paid all taxes assessed on said lands . . . and have, during said 20 years, held such exclusive, peaceable, continuous and adverse possession thereof as comports with the ordinary management of such lands . . . in this State.

**4.** The "camp" referred to in *Stewart* was used by hunting and fishing parties and vacationers. It had been standing less than twenty years at the time of suit.

After a careful review of the record on appeal, we conclude that the presiding justice erred in treating this case as if it were plainly controlled by the decision of the first issue in *Stewart v. Small, supra.* There are important distinguishing features, full consideration of which might have led to a different result if the presiding justice had not regarded *Stewart v. Small, supra,* as controlling in the characterization of the conduct of the Dowleys and their predecessors with respect to the northern lot.

■ Possession sufficient to ripen into title must be actual, open, notorious, hostile, under claim of right, continuous, and exclusive for a period cf at least twenty years. *Hibbard v. Robert G. Fromkin Woolen Corp.,* 156 Me. 433, 165 A.2d 49 (1960); *Shannon v. Baker,* 145 Me. 58, 71 A.2d 318 (1950). "There is no fixed rule whereby actual possession of real property by a hostile claimant may be determined." *Stewart v. Small, supra,* at 271, 110 A. at 684, and each case must be separately considered on the basis of the particular circumstances presented. *Adams v. Clapp,* 87 Me. 316, 32 A. 911 (1895).

In order to determine whether the Dowleys have carried their burden of proving their asserted possessory title,[5] it is necessary to analyze the concept of adverse possession and decide on the significance of its various elements in this case. Here, the first question is whether, all circumstances considered, the conduct of Lowell Smith and his successors in relation to the northern lot amounted to possession.

The trial court found that the northern lot was an unimproved wood lot and that the Smiths cut wood on the lot "from time to time". In view of the rural nature of the locale, we may infer from the evidence of record that use of the parcel as a wood lot was an appropriate one. There is no finding as to how long such cutting persisted, though the implication from the tenor of the justice's opinion is that it had continued longer than twenty years. That conclusion is supported by evidence of record that Lowell Smith's son, Robert, continued cutting after Lowell died in the 1940s and that Lowell's grandson, Raymond Clark, continued the cutting after his uncle Robert died in 1967.

■ In order to decide whether the cutting that took place sufficed to constitute "possession" of the northern lot, it is necessary and sufficient to inquire whether the actual use and enjoyment of the lot by Smith and his successors amounted in kind and degree to the use and enjoyment to be expected of the average owner of such property. 3 *American Law of Property* § 15.3 at 767 (Casner ed. 1952 and Supp. 1977 at 578). There is testimony in the record, particularly that of Smith's grandson, Raymond Clark, indicating that the wood–cutting on both lots amounted to a substantial operation. Clark testified that the fir and the soft woods were differentiated in treatment; logging equipment was used; the downed trees were cut up and peeled *in situ* ; cut wood was stacked for collection on the state–aid highway bordering both lots on the west. Clark testified, also, to the effect that cutting operations took place indiscriminately on both lots. However, it is for the finder of fact, not this court, to evaluate this testimony in the context of the whole case to determine whether the use of the north lot successively by Lowell and Robert Smith and Raymond Clark amounted to that of the average owner of such a lot. If so, they were "in possession of" the northern lot.

*Stewart v. Small,* 119 Me. 269, 110 A. 683 (1920), does not hold to the contrary. The first issue in that case was resolved against the party claiming by adverse possession, not because his use and enjoyment of the woodland there in question was inappropriate or inadequate for an owner of such land in the circumstances, but because the court thought the possession not sufficiently open, notorious, hostile, extensive, and con-

---

**5.** The burden of establishing title by adverse possession is on the party alleging it. *Webber*

*v. McAvoy,* 117 Me. 326, 104 A. 513 (1918).

tinuous. The tract in question appears not to have adjoined land owned by the claimant. It does not appear to have been bordered by a highway. The court evidently found lacking the "clear proof of acts and conduct fit to put a man of ordinary prudence, and particularly the true owner, on notice that the estate in question is actually, visibly and exclusively held by a claimant in antagonistic purpose."

That the nature and extent of the adverse claimant's use of the woodland tract in *Stewart v. Small* was not the critical factor in the Law Court's resolution of the first issue in that case is brought out clearly by the court's resolution of the second issue. The adverse claimant, Small, asserted possession of a second woodland parcel under color of title and with payment of all taxes for over twenty years. Although Small's use of the second parcel, for cutting of wood, was similar to his use of the first parcel, this court had no difficulty in upholding a verdict and judgment awarding him title by adverse possession. Although he had the benefit, in claiming the second parcel, of being able to invoke the provisions of the precursor of 14 M.R.S.A. § 816, he had to show nevertheless that his acts amounted to possession. He used the tract in connection with his adjoining homestead farm; tote roads ran through the tract.

The real difference between the two tracts in *Stewart* lay in the degree of openness and notoriety of possession. Small's use of the two tracts was similar. His claim of ownership to the second tract was buttressed, of course, by the fact that he paid the taxes on it for the required period. From the language employed by the Law Court in denying Small title by adverse possession of the first tract, it seems that the proof was not clear that Small's conduct with respect to that tract was such as to "put a man of ordinary prudence, and particularly the true owner, on notice that the estate in question" was visibly and exclusively held by a claimant in antagonistic purpose. 119 Me. at 271, 110 A. at 684.

6. *See Holden v. Page*, 118 Me. 242, 245, 107 A. 492, 494 (1919), borrowing the quoted expres-

The transcript of the trial in the instant case contains testimony from which certain facts could be inferred that would distinguish the Smiths' conduct with respect to the northern lot from Small's conduct with respect to the first tract in *Stewart v. Small*. A state–aid highway ran the length of the Smiths' northern lot, and the testimony of Raymond Clark and others was unrebutted that the Smiths and Clark used that public highway openly for collection and pick–up of cut wood. The boundary between the Sinford land and the northern lot appears to have been marked by an old "page wire" fence, which, if Clark's testimony is believed, marked the northern boundary of the wood–cutting operations of the Smiths and Clark. Nothing in the testimony suggests that the Smiths or Clark used the northern lot surreptitiously or covertly or in any respect less openly than an ordinary owner of such a lot in that locale would use it.

Although we agree with the presiding justice that acquiring title to wild lands through common law adverse possession is difficult, there is a significant distinction between "lands in a wilderness state" [6] and the wood lot at issue here. In *Hibbard v. Robert G. Fromkin Woolen Corp.*, 156 Me. 433, 435, 165 A.2d 49, 51, we reasoned as follows:

. . . The jury could properly conclude that here there was more than the mere occasional acts of trespass found insufficient in *Webber v. McAvoy*, 117 Me. 326 [104 A. 513]; *Stewart v. Small*, 119 Me. 269 [110 A. 683]; and *Webber v. Barker*, 121 Me. 259 [116 A. 586]. In such cases as these the court has shown a natural reluctance to permit relatively furtive and secret encroachments on large woodland areas to ripen into title. Certainly no such considerations have application where, as here, the premises comprising cleared land were in proximity to a populous community and every act of occupancy was obvious and apparent.

sion from *Stevens v. Owen*, 25 Me. 94, 100 (1845).

■ There was considerable testimony that Lowell Smith and his successors claimed ownership of the northern lot to the Sinford line, demarcated by a "page wire" fence. A fence is not characteristic of land in a wilderness state, nor does the fact that a state–aid highway formed the entire westerly boundary of both the northern and southern lots have any tendency to show that the lot was "land in a wilderness state" for purposes of applying the rules on adverse possession.

The evidence was strong that Smith and his successors used the lot as owners, not in subordination to superior title in anyone else. They paid all taxes on the lot, and former town officials testified that Lowell Smith and his successors always referred to the lot as theirs. The appellees did not testify, and there is no evidence that they or their predecessors ever exercised or attempted to exercise any control over the lot after 1914. The Davises stopped paying taxes on any part of the Watts lot after 1914.

The appellees undertook to show that Raymond Clark and Annie Smith acknowledged the appellees' title by seeking to obtain quitclaim deeds from the appellees, or some of them, when the Dowleys sought to purchase the entire Watts lot in 1978. If Lowell Smith and his successors had acquired title by adverse possession before 1978, the Dowleys' effort in that year to perfect the record title had no tendency to show that their predecessors' use of the lot for over fifty years had been merely trespassory with recognition of superior rights of ownership in some other person.

■ Whether specific possessory acts are sufficient to establish title through adverse possession can only be resolved in light of the nature of the land, the uses to which it can be put, its surroundings, and various other circumstances. *Merrill v. Tobin*, 30 Fed. 738, 741 (C.C.N.D. Iowa 1887); *Worth-*

*ley v. Burbanks*, 146 Ind. 534, 45 N.E. 779 (1897); *Cooper v. Carter Oil Co.*, 7 Utah 2d 9, 316 P.2d 320 (1957). *See* 3 *American Law of Property* § 15.3 at 765–68 (Casner ed. 1952). To judge from the record, the instant case is one in which there is considerable evidence of the openness and notoriety of the adverse use, so that the concern for those elements which led this Court to decide against the adverse claimant on the first issue in *Stewart v. Small, supra*, would not have been troublesome here if the trial justice had decided in favor of the Dowleys. Besides the evidence discussed above, the testimony presented to the trial court shows that several of the appellees or their predecessors resided in or near Roque Bluffs, the community in which the land in question was located. Moreover, as the presiding justice found, the general reputation in the community was that Lowell Smith owned the northern lot bordered by Sinford's property line at the page wire fence, as well as the southern lot.

■ However, in the first instance, it is for the trial court, not the appellate court, to weigh the testimony, find the facts, and apply the law to the facts as found. Hence, we do not reverse the judgment below but vacate it, and remand the case to the Superior Court for reconsideration on the record in the light of this opinion.

The entry is:

Appeal sustained.

Judgment vacated.

Remanded for further proceedings in the light of the opinion herein.

Appellants allowed costs on appeal.

All concurring.