**Mahlon H. GLIDDEN, et al.**

v.

**Stevan BELDEN, et al.**

Supreme Judicial Court of Maine.

Submitted on Briefs March 20, 1996.

Decided Nov. 4, 1996.

Jed Davis, Jim Mitchell and Jed Davis, P.A., Augusta, for Plaintiffs.

Kim M. Vandermeulen, Vandermeulen, Goldman & Allan, P.A., Augusta, for Defendants.

Before WATHEN, C.J., and ROBERTS, GLASSMAN, CLIFFORD, DANA and LIPEZ, JJ.

LIPEZ, Justice.

The plaintiffs Mahlon H. Glidden ("Mahlon Sr.") and Mahlon S. Glidden ("Biff") appeal from the judgment entered in the Superior Court (Kennebec County, *Pierson, J.*) holding that: (1) the Rangeway was abandoned and ownership to the center line thereof reverted to defendants Stevan and Cheryl Belden; (2) the Gliddens do not have a prescriptive easement over the Woods Road; (3) they are liable for treble damages to the Beldens in the amount of $18,000 for willful trespass on the Woods Road, and liable for damages in the amount of $5,000 for trespass on a portion of the former Rangeway; and (4) they must pay attorney fees in the amount of $3,000 and the costs of the litigation. The Gliddens contend that the court erred in all of its holdings. Although we disagree with that contention, we have concluded that the conflicting claims over the status of the Rangeway must be left for future resolution pursuant to the statutory scheme enacted by the Legislature in 1987 for the purpose of clarifying title to proposed, unaccepted, unconstructed ways that are laid out in recorded subdivision plans. 23 M.R.S.A. §§ 3031–3035 (1992 & Supp.1995). We must therefore vacate both the court's ruling as to the Beldens' ownership to the center line of the Rangeway and that portion of the judgment relating to the finding of trespass by the Gliddens on the Rangeway. Otherwise, we affirm the judgment.

### Background

The following facts were adduced at the trial. In 1797, the Kennebec Proprietors divided all of the land in the Town of Harlem (now China) into rectangular lots.[1] Some lots were retained by the Proprietors, while

---

1. The reference to the Kennebec Proprietors requires some historical background. In 1753, the heirs of the Boston merchants who had owned all the land between Lake Cobbosseconte on the north to the mouth of the Kennebec River, including fifteen miles on either side of the river, invited a group of individuals in Maine—the "Kennebec Proprietors"—to form a corporation to exploit that territory. Ronald F. Banks, *Maine Becomes a State* 47 (1970). By 1789 the Commonwealth of Massachusetts had established new boundaries for the grant, known as the Kennebec Purchase, declaring that all who settled there prior to 1784 would receive 100 acres free and all who squatted there after 1784 were to be sold the land at a fair price. *Id.* However, as Banks recounts:

> [w]hile the intricacies of the conflict elude facile generalizations, it is not inaccurate to say that proprietors moved in, secured the support

of the "strong arm of the law," and attempted to eject settlers who were unable to pay for the land or who tried to avoid paying for it. Settlers complained that ... the proprietors offered no payment for improvements. Others charged that because of conflicting claims they were charged as many as three times by different companies. Above all, the settlers were angered by the continued alienation of huge tracts of land to speculators for little money. *Id.* at 47–48.

By the early 19th century the situation deteriorated into a species of guerilla warfare, with "squatters masquerading as Indians [firing] from behind trees at sheriff's deputies enforcing court decrees"; one of the Proprietors' surveyors was shot to death. *Id.* at 48. In 1808, the Massachusetts legislature responded by passing the "Betterment Act," which provided that Proprietors who wanted to evict squatters who had lived on

others were conveyed to settlers. To provide access to the lots, the Proprietors laid out narrow strips of land called rangeways. On direct examination, a surveyor who testified at the trial on behalf of the Gliddens opined that the rangeways were intended to provide the lot owners with private access to their lots. On cross-examination, he stated that the rangeways were intended to provide public access to the lots.[2] Another surveyor, whose letter to the Beldens regarding the status of the Rangeway[3] was admitted as an exhibit (he did not testify), asserted that the rangeways were intended to provide "access" without designating whether the access was for the lot owners and their guests or for the public-at-large.

The defendants Stevan and Cheryl Belden now own a piece of land that is partly comprised of lots 71 and 72 of the Proprietors'

original lot plan.[4] The plaintiffs Mahlon Sr. and Biff now own a piece of land that is partly comprised of lots 100 and 101 of that plan. The same Rangeway forms the easterly border of the Beldens' parcel and the westerly boundary of the Gliddens' parcel (*see* attachment).

In 1840, the Town of China selectmen voted to accept a town way that became known as the Old Dudley Road. The Old Dudley Road was laid out within the above-described Rangeway for the benefit of a John C. Sutherland, a property owner in the area, a portion of whose land now belongs to the Gliddens.

In the 1930s, several parcels south of what is now the Beldens' property were used for timber harvesting. To access those parcels for the purposes of wood hauling, the har-

---

their lands for six years could not do so without paying them a fair price for improvements, and that those squatters allowed to remain were required to pay the Proprietors within a year a price equal to the land's value before improvement. Laws of Massachusetts 1807–16, IV, at 19–21 (1816). However, most settlers could not survive the one-year credit arrangement and few met the six-year residence requirement. Banks, *id.* at 56.

The earliest Maine case law reflects both the violence of these conflicts and the Kennebec Proprietors' attempts to dispossess settlers and squatters in the courts. *See Proprietors of the Kennebec Purchase v. Tiffany*, 1 Me. 219, 224–26 (1821) (recovery of possession from tenant who had relied on erroneous description furnished by Proprietors' surveyor); *Proprietors of the Kennebec Purchase v. Lowell*, 2 Me. 149, 150 (1822) (recounting 1795 incident in which Proprietors' surveyor was "intercepted by armed men, in disguise, and compelled, by threats of instant death, to desist from farther proceedings; ...."). What may have been the most important consequence of the Kennebec Purchase surely was an unintended one: the solid constituency it created for separation from Massachusetts, which had provided the Kennebec Proprietors the means of land speculation at the expense of the common settler, and statehood for the district of Maine. Banks, *id.* at 47, 53.

A more charitable view is provided in the history authored by Robert Gardiner, a descendant of Dr. Sylvester Gardiner, perhaps the leading proprietor. Robert H. Gardiner, "History of the Kennebec Purchase," *Collection of the Maine Historical Society*, II, 1st Series 269–94 (1847). Gardiner, while admitting to the Proprietors' short-sighted practices of the late 18th and early 19th centuries, asserts that

but for the exertions of the Company, at a time when single settlers could not have established themselves here, the planting of Kennebec must have been delayed at least the third of a century; and it may not be extravagant to say, that if the towns on the Kennebec had not been built, the interior country would not have been settled, and the population which now occupies the most important portion of the State, would have been scattered in other regions, and Maine would scarcely yet have acquired vigor to become independent of the Parent State.

*Id.* at 294.

The corporation dissolved in 1816, when the Kennebec Proprietors auctioned off what was left of the purchase beyond what each Proprietor had taken for himself. Banks, *id.* at 387 n. 17 (citing Gardiner, *id.* at 293).

2. This testimony seems contradictory. The reference to access for the lot owners suggests private access limited to the lot owners and their guests. The reference to public access to the lots suggests access for the public-at-large.

3. Throughout this opinion, we refer to the Rangeway at issue in this case with a capital "R." In certain places, we also refer generally to all of the rangeways laid out by the Proprietors, and those are designated with a lower case "r."

4. The Proprietors' original lot plan was recorded for the first time in about 1900. The record does not indicate by whom.

vesters used a road known as the Woods Road, which cuts across the easterly corner of the Beldens' property, from a point just south of Route 3 to a point where it intersects the Rangeway.

In the 1930s through the 1950s, except for a period of time when he was serving in the military, Mahlon Sr. used the Woods Road to haul timber and gravel. Thomas Dinsmore's father, who owned what is now Mahlon Sr.'s land during the 1950s, also used the Woods Road to haul wood. Thomas Dinsmore testified that his father did not ask permission to use the Woods Road from the people whose land it crossed because he believed the road was either an old town road or a county road. In 1967, when he bought a portion of the land he now owns, Mahlon Sr. continued to use the Woods Road to haul timber and gravel. In 1972, Mahlon Sr. purchased another parcel of land adjoining the property he acquired in 1967. He and Biff planned to develop this real estate into a subdivision.

In 1982, the Beldens purchased their property. At that time, Stevan Belden and Biff had a conversation in which Biff claimed the existence of a right of way over the Woods Road, and Stevan denied there was such a right of way. In 1988, the Gliddens applied to the Town of China for approval of their proposed subdivision. In their original subdivision plan, the Gliddens intended to provide access to the subdivision over the Bessey Road, which Mahlon Sr. had constructed in the 1960s. That road, however, traversed property belonging to neighbors, the Besseys, and the town noted in its approval of the subdivision plan that the road was not a right of way of record. After negotiating unsuccessfully with the Besseys for the purchase of a right of way corresponding with the Bessey Road, the Gliddens approached the Beldens about a possible right of way on the eastern boundary of the Beldens' property. Thus, in 1987 and 1988, Stevan had conversations with Mahlon Sr. and Biff, respectively, in which the latter asserted a right of way over the Woods Road and Stevan again disagreed. During the conversation with Mahlon Sr., Stevan stated clearly that

he did not want them to use the road because of its proximity to his home and during both conversations he even offered the Gliddens an alternative route across the western end of his property free of charge.

In July 1988, Biff cleared a roadway with a bulldozer in a portion of the Rangeway claimed by the Beldens as part of their property. In September 1988, Biff dumped and smoothed some gravel on the Woods Road. In September 1989, the Gliddens brought this action seeking a declaration of the location, width and allowable use of the right of way over the Woods Road; a declaration of title regarding the portion of the Rangeway abutting the Beldens' property; a declaration of an easement by necessity over the Rangeway to enable access to the subdivision; and damages and injunctive relief for the Beldens' interference with their right to use the Woods Road and the Rangeway.

The Beldens answered and asserted several counterclaims against the Gliddens, including the claim that they had acquired title to the portion of the Rangeway abutting their property by adverse possession by virtue of a recorded deed, payment of taxes thereon for a period of twenty years, and adverse possession for twenty years, pursuant to 14 M.R.S.A. § 816 (1980). The Beldens also asserted trespass claims against the Gliddens for the work done on the Woods Road and on the Rangeway, and they sought treble damages for both counts of trespass on the theory that the Gliddens acted willfully when they did the work on the Woods Road and the Rangeway.

After a one-day trial the court issued a written decision holding that the Old Dudley Road and the Rangeway were abandoned under the common law doctrine of abandonment, and that title to the center line of the Rangeway passed to the Beldens' predecessors in interest at the time of the abandonment. With respect to the Woods Road, the court held that the Gliddens had not established a prescriptive easement because they had not proved that their use was either adverse or under a claim of right. The court

further found that the Gliddens were not entitled to an easement by necessity over the Rangeway because at least two alternate routes are available for access to the subdivision.

On the Beldens' counterclaims, the court found that the Gliddens willfully trespassed on the Beldens' property when they did the work on the Woods Road, and further found that the Gliddens had trespassed when they worked on the Rangeway, but not willfully.[5] The court awarded the Beldens treble damages of $18,000 for the trespass on the Woods Road, $5,000 for the trespass on the Rangeway, attorney fees in the amount of $3,000, and other costs of the litigation.

### Discussion

#### Title to the Rangeway

The court concluded that title to the center line of the Rangeway was vested in the Beldens.[6] That conclusion was based on two subsidiary conclusions: first, that the Old Dudley Road, contained within the Rangeway, was a public way that was abandoned in 1969; second, that the Rangeway itself was a public way that was abandoned in the 1800s. Because the court considered both to be public ways, and found that they had been abandoned prior to enactment of the statutory rule of abandonment, *see* 23 M.R.S.A. § 3028 (1992), it applied the common law doctrine of abandonment. The common law doctrine of abandonment vests title in abutting landowners to the center line of a public way when the way is abandoned. *Martin v. Burnham,* 631 A.2d 1239, 1241 (Me.1993).

The court's determination that the Rangeway was a public way was a legal finding, and thus we review it de novo. *Estate of Hardy,* 609 A.2d 1162, 1163 (Me.1992) (legal

determinations subject to de novo review). Our review of the case law disclosed only two cases that discuss the rangeways: *Howard v. Hutchinson,* 10 Me. 335 (1833) and *Small v. Pennell,* 31 Me. 267 (1850). These two cases are instructive. In *Howard v. Hutchinson,* we considered the rights of the Town of Sidney arising from the original laying out, division and sale of lots that comprised the Town:

[I]n 1761, the tract of country now comprised within the limits of the town of Sidney, and adjoining the Kennebec river, was divided into lots by direction of the Proprietors of the Kennebec purchase, at that time the owners of the whole tract. The division was made and plan returned by one Winslow. The plan represents three ranges of lots;—the first range lying upon the river and extending back one mile, the second including the second mile from the river, and the third range including the third mile; so that each range was one mile in width. It is understood that there was no actual survey, except on the river, and that all the other lines of the three ranges were laid down without reference to known monuments or actual admeasurement. *The plan represents a vacant space of eight rods in width between each of these ranges, as left for roads; but as there had been no actual examination or laying out of the roads, the surveyor, in addition to his return, adds, that the reservations for roads are to be altered according to the convenience of the settlers....* Whatever rights may have been acquired by the owners of adjoining lots, it is clear that the town of Sidney acquired no right of soil in these reservations. The fee either remained in the original proprietors, or passed with the grant of the lots adjoining.

---

5. The court also found that the Beldens had not established ownership of the Rangeway by adverse possession. Despite this ruling, the Beldens prevailed on their ownership claim to a portion of the Rangeway because of the court's ruling on its abandonment.

6. Pursuant to the court's decision, the Gliddens would also own to the center line of the Rangeway in that portion of the Rangeway that abuts their property.

*Howard,* 10 Me. at 347–48 (emphasis added).[7] We noted that the reservations for roads were beginning to be known at that time as "rangeways." *Id.* at 347. We also held that ownership of the rangeways remains with the Proprietors unless they expressly convey their interest therein or the public-at-large acquires an easement over them by the laying out of a road by the municipality pursuant to the enabling statute or by user. *See id.,* at 348–49. Later, in *Small,* we confirmed that the public-at-large may acquire an easement in the rangeways by the laying out of a road or by "long user." 31 Me. at 270.

■ Pursuant to *Howard* and *Small,* more was required than the mere appearance of the rangeways on the Proprietors' lotting scheme for the public to acquire actual rights in them. The public-at-large is capable of acquiring a non-possessory interest in land in one of three ways: by a town's acceptance of a way in accordance with the relevant enabling statute;[8] by acceptance of a dedication of property rights in a way by the owner of the way; or by prescription, *i.e.,* continuous, open, public use of a way for a period of at least twenty years. *Town of Manchester v. Augusta Country Club,* 477 A.2d 1124, 1128–29 (Me.1984) (citing *Vachon v. Inhabitants of the Town of Lisbon,* 295 A.2d 255, 259 (Me.1972)).

There is no evidence in this case that the Town ever designated or accepted the Rangeway as a town way or a county way pursuant to the relevant enabling statute.[9] There is also no evidence that the public-at-large continuously and openly used the Rangeway for a period of at least twenty years at any point since its appearance on the original lotting scheme for the Town.

■ There are similar proof problems with dedication, which requires that the land in question must have been "dedicated" by the grantor for a public purpose, *Augusta Country Club,* 477 A.2d at 1129, and that the public must have "accepted" the dedication. *Id.* Acceptance must be by an affirmative act, *id.,* and that act must indicate acceptance of the terms of the dedication. *Vachon,* 295 A.2d at 260. The affirmative act can be a vote at a town meeting. *See id.* Alternatively, the "affirmative act" can be the " 'actual enjoyment by the public of the use for such a length of time that the public accommodation and private rights would be materially affected by a denial or interruption of the enjoyment.' " *Id.* (quoting *Northport Wesleyan Grove Camp–Meeting Ass'n v. Andrews,* 104 Me. 342, 347, 71 A. 1027, 1029 (1908)).

■ Although the trial testimony of the Gliddens' surveyor, the letter from the Beldens' surveyor to the Beldens, and the discussion of the rangeways in *Howard* and *Small* indicate that the Proprietors intended to dedicate the Rangeway to public use,[10]

---

7. In *Howard v. Hutchinson,* 10 Me. 335 (1833), the plaintiff sued the surveyor of highways for the Town of Sidney alleging trespass for the cutting down and carrying away of trees. The surveyor defended on the grounds that the place where the trespass was alleged to have taken place, a portion of a rangeway laid out by the Kennebec Proprietors, was a highway laid out by the Town of Sidney. We agreed with the plaintiff that the highway was not properly laid out because the plaintiff was not given notice of the laying out even though the statute contained a notice requirement. We then considered whether the Town had rights in the rangeway pursuant to any other theory and concluded that it did not, and therefore that it was liable in trespass.

8. Today the enabling statute for the laying out of town ways and public easements is 23 M.R.S.A. § 3022 (1992 & Supp.1995). This statute has existed in various forms since Maine was part of the Commonwealth of Massachusetts. *See* 1786 *Mass. Acts,* ch. 67.

9. Although the Old Dudley road was laid out within the boundaries of the Rangeway, the status of the Old Dudley Road as a town way does not transform the entirety of the Rangeway into a public way. Also, the Old Dudley Road and the Rangeway are legally separate entities.

10. *Accord* Knud E. Hermansen & Donald R. Richards, *Maine Roads and Easements,* 48 Me. L.Rev. 197, 207 (1996) (stating that "[t]he purpose of range-ways appears to have been to provide potential access from the various proprietors' lots to the roads and rivers used for commerce.").

there is no evidence in the record of a town vote approving the lotting scheme by which the rangeways were dedicated, or of use by the public-at-large for such a length of time that public rights would be materially affected by a denial or interruption of its enjoyment thereof.[11] The dedication by the Proprietors never became effective and, therefore, the Rangeway never in fact became a public way. The court's conclusions that the Rangeway was a public way, and that the doctrine of common law abandonment applied to the determination of title as between the Gliddens and Beldens, were erroneous.

■ There remains the issue of ownership of the land within the Rangeway. In addressing this issue, we first note the rough similarity between the lotting scheme used by the Kennebec Proprietors and the modern subdivision.[12] In 1987 the Legislature enacted "An Act to Enhance the Marketability of Titles," P.L.1987, ch. 385, §§ 1–4 (effective Sept. 29, 1987) (codified at 23 M.R.S.A. §§ 3031–3035 (1992 & Supp.1995) & 33 M.R.S.A. §§ 460, 469–A (1988)), for the purpose of clarifying title in proposed, unaccepted ways in subdivisions. Both the statutory scheme and the legislative history make clear that the law was intended as a "comprehensive attempt to deal with a variety of title and title marketability problems presented by old, proposed, unaccepted streets shown on subdivision plans," L.D. 1776, Statement

of Fact (113th Legis.1987), and therefore that it was intended to apply retroactively. *See* 23 M.R.S.A. § 3035 (1992) ("Sections 3031 to 3034 shall be liberally construed to affect [sic] the legislative purpose of enhancing the merits of title to land by eliminating the possibility of ancient claims to proposed, unaccepted, unconstructed ways that are outstanding on the record but unclaimed.").

The statute provides in pertinent part:

**1. Deemed vacation.** A proposed, unaccepted way or portion of a proposed, unaccepted way laid out on a subdivision plan recorded in the registry of deeds prior to the effective date of this section shall be deemed to have been subject to an order of vacation under section 3027[13] if the way or portion of the way has not been constructed or used as a way and has not been accepted as a town, county or state way or highway by the later of:

A. Fifteen years after the date of the recording of the subdivision plan laying out the way or portion of the way; or

B. Ten years after the effective date of this section.

A way or portion of a way considered vacated under this subsection is subject to section 3033.

**2. Extensions.** The municipal officers of the affected municipality may except a proposed, unaccepted way or portion of a

---

**11.** No one who testified at the trial could state that the Rangeway was used by individuals or the public-at-large during the last sixty-plus years. Indeed, they all testified that the Rangeway was overgrown and not in use. Aerial photographs taken in 1939, 1980, and 1984 also indicate that the Rangeway was not in use at any of those times.

**12.** The term "subdivision" is not defined in 23 M.R.S.A. § 3031 or anywhere else in chapter 304, "Acquisition of Property for Highway Purposes," of which section 3031 is a part. *See* 23 M.R.S.A. §§ 3021–3035 (1992 & Supp.1995). The term is defined in the Use Regulations set forth in the Revised Statutes. Although this definition arguably does not apply when interpreting section 3031, the definition describes what the Proprietors did in 1797:

"Subdivision" means a division of an existing parcel of land into 3 or more parcels or lots

within any 5–year period, whether this division is accomplished by platting the land for immediate or future sale, or by sale of the land by metes and bounds or by leasing.
12 M.R.S.A. § 682(2) (1994).

**13.** Section 3027 sets forth in subsection 1 the procedure for the vacation by municipal officers of proposed town ways in subdivisions and, in subsection 2, that for the revocation of dedications of related property or interests in property to the municipality. The rights of action pursuant to such orders provided in section 3027–A(2), however, are irrelevant to claims relating to proposed, unaccepted ways that are deemed vacated pursuant to section 3032. The rights of action applicable to those claims are set forth in section 3033. *See* 23 M.R.S.A. § 3032(1).

proposed, unaccepted way described in subsection 1 from the operation of time limitations of that subsection by filing, in the registry of deeds where the subdivision plan is recorded, a notice stating that the way or portion of the way is excepted from the operation of subsection 1 for a period of 20 years from the filing of the notice. To be effective, this exception must be filed prior to the expiration of the time limitations of subsection 1. An extension accomplished under this subsection may be extended by the municipal officers for a subsequent 20–year period by the filing of a new notice within the preceding 20–year extension period.

23 M.R.S.A. § 3032 (footnote added). Thus, the statute establishes deadlines for the vacation of proposed, unaccepted ways of either fifteen years after the recording date of the relevant subdivision plan or ten years after the law's effective date (September 29, 1987), whichever comes later. Once the relevant deadline passes, and unless the affected municipality accepts and constructs the way or files a notice under section 3032(2) to except the way in question from the operation of section 3032(1) (which exception lasts twenty years and may be extended for another twenty years), any incipient rights in the way terminate and it then becomes subject to the private rights of action set forth in section 3033.

Section 3033 invites any person claiming to own a way vacated under section 3032 to record in the registry of deeds a notice whose form and content is stipulated in the statute. 23 M.R.S.A. § 3033(1). Notice also must be given to the relevant current record owners and their mortgagees. *Id.* Those who receive notice and who claim a private right in the vacated way will forever be barred from maintaining an action at law or equity regarding that right unless they file in the registry of deeds where the relevant subdivision plan was recorded a statement under oath "specifying the nature, basis and extent of [their] claimed interest" within one year from the date of the recording of the notice. 23 M.R.S.A. § 3033(2). A claimant's asserted right will be lost unless, within 180 days of the recording of their statement, the claimant commences an action in equity to establish it. *Id.* (citing 14 M.R.S.A. §§ 6651 et seq. (1980 & Supp.1995)).[14] The trial of any such action may result in judgment for the claimant only if the court finds that the claimant has acquired an interest in the way and a deprivation of the claimant's rights will unreasonably limit access from his or her land to a public way, a public body of water, or common land or a common facility within the subdivision. 23 M.R.S.A. § 3033(3). The court has the discretion to render any such judgment in terms of reasonable damages instead of establishment of the claimant's rights, though in no case shall a municipality be liable for any of the damages. *Id.*

The record reveals that the lotting scheme of the Kennebec Proprietors at issue in this case was first recorded in about 1900. Thus, pursuant to section 3032(1)(B), the Town of China has until September 1997, ten years after the effective date of section 3032, to either except the Rangeway from vacation under section 3032(1) by filing a notice of extension, to accept and construct the way, or to allow the way to be deemed vacated.[15] Should the municipality allow the way to be deemed vacated, persons claiming to own the Rangeway—including the Beldens, the Gliddens, and any successors in interest or heirs

14. "The limitation periods in this section are not tolled or interrupted by any disability, minority, lack of knowledge or absence from this State by the claimant." 23 M.R.S.A. § 3033(2).

15. The significance of these deadlines has been reported in the press. *See* John Richardson, *End is Near for 'Phantom' Roads*, Me. Sun. Telegram, Sept. 8, 1996, at 1A, 14A (noting that the statute's ten-year grace period for securing public property rights in almost all "paper streets" will expire in September 1997). *See also* Hermansen & Richards, 48 Me.L.Rev. at 207 ("Range-ways are thought of in a general sense as 'paper streets' because they exist only on paper, in the description of the conveyance.").

of the Kennebec Proprietors [16]—may file notice under section 3033(1) or attempt to establish their rights in response to such notice by filing a statement and commencing an action in equity pursuant to section 3033(2).

Accordingly, we vacate the court's ruling as to the Beldens' ownership of the Rangeway and that portion of the judgment relating to the finding of trespass by the Gliddens on the Rangeway, and leave to future resolution the determination of who owns the Rangeway pursuant to the statutory scheme set forth in 23 M.R.S.A. §§ 3031–35.

### Denial of the Gliddens' post-trial motion to admit exhibit

Seven months after the trial, and prior to the issuance of the court's decision, the Gliddens moved to admit as an exhibit a notice of proposed discontinuance of the Old Dudley Road by the Town of China, dated March 21, 1994. The court denied the motion. The Gliddens contend that the notice that the Old Dudley Road was a town way was relevant to the issue of ownership of the Rangeway and that the court's refusal to consider it was an abuse of discretion.

■■■ A party who has finished presenting its case may not introduce further evidence except in rebuttal or, if not in rebuttal, unless the court's permission is obtained. M.R.Civ.P. 43(j). The determination whether a party may reopen its case after the close of the evidence is a matter within the discretion of the trial court. *New England Hotel Realty, Inc. v. Finley*, 508 A.2d 121, 122

(Me.1986). There is no necessary inconsistency between the previous common law abandonment of a town way by a town and a subsequent statutory notice of discontinuance. The Gliddens have failed to demonstrate that the court abused its discretion in denying their motion to admit the notice of the proposed discontinuance.[17]

### Prescriptive easement over the Woods Road

■■■ The court concluded that the Gliddens did not establish a prescriptive easement over the Woods Road because they failed to prove that their use was adverse and under a claim of right. We may vacate that conclusion only if we determine that the evidence below *compelled* a contrary holding. *Blackmer v. Williams*, 437 A.2d 858, 862 (Me.1981). It is not sufficient to show that the court arguably could have concluded that the evidence established a prescriptive easement for the Gliddens. Moreover, because neither party requested that the court amend its findings or make additional findings pursuant to M.R.Civ.P. 52(b), we must assume that the court found for the prevailing party on all factual issues necessarily involved in the decision. 437 A.2d at 861. Such assumed findings will not be set aside unless clearly erroneous. *Id.* That is, we will reject a finding only when "there is no competent evidence in the record to support the finding; the finding is based on a clear misapprehension of the meaning of the evidence; or the force and effect of the evidence, taken as a whole, rationally persuades us to a certainty that the finding is 'so against the great

---

**16.** Whether the Kennebec Proprietors retained any ownership rights in the Rangeway is unclear. The original deeds in the Glidden and Belden chains conveying the lots abutting the Rangeway are not in the record. Both the Gliddens' surveyor and the Beldens' surveyor opined that the Proprietors did not convey their interest in the Rangeway in the original deeds conveying the lots. Neither surveyor, however, spoke to the issue of whether this failure to convey was also accompanied by express reservation of title by the Proprietors. The Gliddens' surveyor testified that ownership in the Rangeway is vested in the Proprietors or Thomas Winthrop, to whom they conveyed the residue of their holdings in 1816. The Beldens' surveyor opined that ownership of

the Rangeway is vested in the heirs of the Proprietors. *See* Hermansen & Richards, 48 Me.L.Rev. at 208–09 (title in rangeways can be determined by referring to the original conveyances by the Proprietors).

**17.** The Old Dudley Road was laid out within the Rangeway, a not uncommon situation. *See* Hermansen & Richards, 48 Me.L.Rev. at 208 ("When a public road is established on a rangeway, the width of the public road is not necessarily the width of the range-way."). The legal status of the Old Dudley Road poses a different question than that of the legal status of the Rangeway.

preponderance of the believable evidence that it does not represent the truth and right of the case.' " *H.E. Sargent, Inc. v. Town of Wells,* 676 A.2d 920, 923 (Me.1996) (citation omitted).

■ The party asserting a prescriptive easement must prove

continuous use, for at least twenty years under a claim of right adverse to the owner, with his knowledge and acquiescence, or by a use so open, notorious, visible and uninterrupted that knowledge and acquiescence will be presumed. Each of the elements is essential and each is open to contradiction.

*McGray v. Lamontagne,* 623 A.2d 161, 162 (Me.1993) (quoting *Jost v. Resta,* 536 A.2d 1113, 1114 (Me.1988) (quoting *Dartnell v. Bidwell,* 115 Me. 227, 230, 98 A. 743, 744–45 (1916))). These elements must be proved by a preponderance of the evidence. *See Inhabitants of Town of Kennebunkport v. Forrester,* 391 A.2d 831, 833 (Me.1978) (affirming trial court's conclusion that the claimants had failed to establish a prescriptive easement by a preponderance of the evidence); *see also O'Connor v. Beale,* 143 Me. 387, 387–89, 62 A.2d 870, 871 (1948) (noting without comment trial court's use of preponderance of the evidence standard).

■ Proof of the owner's acquiescence is an essential element in the establishment of a prescriptive easement. *Rollins v. Blackden,* 112 Me. 459, 465, 92 A. 521, 525 (1914). The evidence presented at the trial included uncontroverted testimony by Stevan Belden about conversations he had with Biff and Mahlon Sr. in 1982, 1987, and 1988, in which Belden explicitly refused to recognize the Gliddens' asserted right of way over the Woods Road and told them he did not want them to use the road because it was so close

to his home. Belden also testified about his repeated offers of an alternate right of way across the western end of his property free of charge to the Gliddens. That testimony was corroborated by Biff's testimony. Although the Beldens did not interrupt the Gliddens' continuous use of the property by giving them notice pursuant to 14 M.R.S.A. §§ 812, 813 (1980), we explained long ago that "the statutory method is not exclusive" and is simply a means by which an owner may prevent the acquisition of a prescriptive easement over a way. *Dartnell,* 115 Me. at 232, 98 A. at 745. Indeed, "absence of acquiescence on the part of the [owner] may be evidenced by verbal protest alone." *Noyes v. Levine,* 130 Me. 151, 152, 154 A. 78, 79 (1931) (citing *Dartnell,* 115 Me. at 231–32, 98 A. at 745 (1916) (cases holding that oral remonstrances are sufficient to demonstrate nonacquiescence embrace the doctrine that is founded "upon the better reason")). At the trial the Beldens disproved any suggestion of their acquiescence.

The evidence presented at the trial also raised the possibility that a prescriptive easement over the Woods Road was established prior to the Beldens' purchase of their property in 1982 due to the use of that way by the Dinsmores, the Gliddens' predecessors in interest, beginning in the 1950s. Successive periods of use may be added or "tacked" together in order to satisfy the prescriptive period when privity exists between the users. *Blackmer,* 437 A.2d at 860. However, Thomas Dinsmore testified that his father never asked the Beldens' predecessors in interest for permission to use the road because he had mistaken it for a town way. Pursuant to Maine law, the prescriptive user's state of mind is relevant to proof that the use is adverse under a claim of right.[18] *Blanchard v. Moulton,* 63 Me. 434, 436–37 (1873) (adverse use to "establish a way by prescrip-

---

18. The relevance of state of mind pursuant to Maine law contrasts with the position adopted in some American jurisdictions that the claimant's state of mind is irrelevant if the use itself is inconsistent with the owner's rights. *See, e.g., Chaplin v. Sanders,* 100 Wash.2d 853, 676 P.2d 431, 436 (1984) ("The 'hostility/claim of right' element of adverse possession requires only that the claimant treat the land as his own as against the world.... The nature of his possession will be determined solely on the basis of the manner in which he treats the property. His subjective belief regarding his true interest in the land and his intent to dispossess or not dispossess another is irrelevant.").

tion" is "nothing more than such an use of the property as the owner himself would exercise; and that when a party, in this manner and for the purposes of a way, has received no permission from the owner of the soil, and uses the way as the owner would use it, *disregarding his claims entirely,* using it as though he owned the property himself, that is an adverse user; .... " (emphasis added)); *see Piper v. Voorhees,* 130 Me. 305, 312, 155 A. 556, 560 (1931) (citing *Blanchard,* 63 Me. 434, as authority for "claim of right"); *see also Restatement (First) of Property* § 458 cmts c. & d. (1944) at 2925–27 ("[H]e who claims a right in himself is impliedly asserting an absence of any right in another inconsistent with the right claimed ...; ... the absence of submission to another is evidenced by the fact that the one making the use did so under an affirmative claim of right in himself.").[19]

The Dinsmores' erroneous belief that the Woods Road was a town way precludes any inference that their use of the road was accompanied by an assertion of a claim of right to use in disregard of the owner's rights; that is, the Dinsmores had no intent to use adversely to an owner because they believed they were using a public road to which all members of the public had rightful access. *See Tallwood Land & Dev. Co. v. Botka,* 352 A.2d 753, 756 n. 2 (Me.1976) (cit-

ing *Ricker v. Hibbard,* 73 Me. 105 (1881); *Hitchings v. Morrison,* 72 Me. 331 (1881)); *see also Crosby v. Baizley,* 642 A.2d 150, 153 (Me.1994) (a mistake can make adverse possession unavailable when the mistake utterly negates the party's intent to claim title); *McMullen v. Dowley,* 483 A.2d 698, 700 (Me. 1984) ("[t]he test is the intention to hold adversely ... not the mistake of entry").[20] Given that the Dinsmores' use of the Woods Road did not establish a prescriptive easement, the Gliddens by means of tacking cannot have established such an easement as their successors in interest.

We therefore affirm the court's conclusion that the Gliddens failed to establish a prescriptive easement. The evidence did not compel a conclusion to the contrary.[21]

*Mahlon Sr.'s trespass on the Woods Road*

 The Gliddens contend that the court erred in entering a judgment against Mahlon Sr. because its findings of fact refer only to the use of the Woods Road by Biff. Although this issue was never raised before the court, "when findings of fact are made in actions tried by the court without a jury, the question of the sufficiency of the evidence to support the findings may thereafter be raised whether or not the party raising the question has made in the trial court an objec-

---

19. The "hostile" intent sometimes used to characterize adverse use under a claim of right has nothing to do with demonstrating "a heated controversy or a manifestation of ill will, or that the claimant was in any sense an enemy of the owner of the servient estate." 25 *Am.Jur.2d,* Easements and Licenses in Real Property § 62 at 630–31 (1996); *see Tallwood Land & Dev. Co. v. Botka,* 352 A.2d 753, 756, n. 2 (Me.1976) ("intentional hostility" understood as "an absolute intent to claim the land"); *McMullen v. Dowley,* 418 A.2d 1147, 1152 (Me.1980) (land must be "held by a claimant in antagonistic purpose."); *Glover v. Graham,* 459 A.2d 1080, 1084 n. 7 (Me.1983) (possession must be "hostile, under a claim of right"); *cf.* 2 *Thompson on Real Property* § 341 at 202 (1980) (erroneously citing a Wisconsin precedent that addresses "hostility to the interests or rights of the [owner]" for the proposition that adverseness is defined by "inimical intent" toward the owner).

20. In this context we cite adverse possession precedents such as *Crosby* and *McMullen* because "generally, the hostile and adverse character of the user necessary to establish an easement by prescription is the same as that which is necessary to establish title by adverse possession." 25 *Am.Jur.2d* § 62 at 629–31. *See Dartnell v. Bidwell,* 115 Me. 227, 230, 98 A. 743, 744–45 (1916) (acquisition of prescriptive easement does not differ from that of adverse possession with respect to element of adverseness (citing *Rollins v. Blackden,* 112 Me. 459, 464–65, 92 A. 521, 525 (1914))).

21. The court based its decision on the prescriptive easement claim on the fact that the Gliddens had failed to demonstrate that their use of the Woods Road was not permissive. The appellants correctly point out that permission is a defense to a prescriptive easement claim and the burden of proof should have rested with the Beldens. Therefore, the court decided the prescriptive easement claim correctly for the wrong reason.

tion to such findings or has made a motion to amend them or a motion for judgment." M.R.Civ.P. 52(b). When no relevant findings of fact are made, it is assumed on appeal that the court found for the prevailing party on all factual issues necessarily involved in the decision. *Blackmer*, 437 A.2d at 861. Such assumed findings will not be set aside unless clearly erroneous. *Id.*

■ "One who directs or authorizes a trespass is equally and jointly liable with him who commits it." *Martin v. Brown*, 650 A.2d 937, 939 (Me.1994) (quoting *Chase v. Cochran*, 102 Me. 431, 437, 67 A. 320, 322 (1907)). The record reveals that Mahlon Sr. retained the bulk of the property which the Gliddens argue is accessible by the Woods Road or the Rangeway. The creation of the subdivision was a project pursued jointly by Mahlon Sr. and his son. The court could have inferred that Mahlon Sr. authorized his son to enhance the access over the Woods Road by dumping gravel to make it more passable. Such an inference is further substantiated by Stevan Belden's testimony about the conversation he had with Mahlon Sr. in 1988, in which Mahlon Sr. asserted a right of way over the Woods Road in the context of his plans for the subdivision.[22]

### Willfulness of the Gliddens' trespass on the Woods Road

Having concluded that the Gliddens' trespass on the Woods Road was willful, the

court trebled the damage award of $6,000 in favor of the Beldens pursuant to 14 M.R.S.A. § 7552 (1980).[23] The Gliddens contend that the evidence was insufficient to establish willfulness in their work on the Woods Road because they thought they had prescriptive rights therein.[24]

■ Whether conduct is willful for purposes of 14 M.R.S.A. § 7552 is a question of fact that will not be set aside on appeal unless clearly erroneous. *Tremblay v. DiCicco*, 628 A.2d 141, 144 (Me.1993), *cert. denied*, 510 U.S. 1115, 114 S.Ct. 1062, 127 L.Ed.2d 382 (1994). As used in section 7552, " '[w]illfully' ... is intended 'to embrace conduct on the part of the defendant which displays an utter and complete indifference to and disregard for the rights of others.' " *Bonk v. McPherson*, 605 A.2d 74, 77 (Me. 1992) (quoting *Guilmet v. Galvin*, 597 A.2d 1348, 1349 (Me.1991)). At the time of the trespass, pursuant to a series of conversations between Biff Glidden and Stevan Belden, the Gliddens knew that the Beldens disputed their claim to the Woods Road. Additionally, the Gliddens made no effort to determine what their rights or the Beldens' rights were prior to doing the work. This evidence is sufficient to support the court's conclusion that the Gliddens acted willfully. *Tremblay*, 628 A.2d at 144 (upholding finding of willful conduct when defendant knew boundary was in dispute and did not make effort to determine actual boundary before doing work that constituted trespass).

22. According to Belden, Mahlon Sr. "asked us what the problem was as to why we would not give them a deed to the [R]angeway and said that we did not own [the Rangeway], and they'd have to use our Woods Road; and I told him that it was too close to the house, I did not want them using it, and then I offered to give a right of way [in a different location] free of charge, but he just was quite upset, just hollering no, no, no, no, I'm not going to build a road so you can sell ten house lots and we can sell four."

23. 14 M.R.S.A. § 7552 (1980), at the time of this litigation, provided:

Whoever cuts down, destroys, injures or carries away any ornamental or fruit tree, timber, wood, underwood, stones, gravel, ore, goods or property of any kind from land not his own, without license of the owner, or injures or

throws down any fences, bars or gates, or leaves such gates open, or breaks glass in any building is liable in damages to the owner in a civil action. If such an act or such acts are committed willfully or knowingly, the defendant is liable to the owner in treble damages and, in addition, for the cost of any professional services necessary for the determination of damages, for attorney's fees, and for court costs.

24. The Gliddens do not dispute the court's conclusion that, in the absence of a prescriptive easement over the Woods Road, their actions thereon amounted to a trespass. They dispute only the court's conclusion that those actions were willful for purposes of 14 M.R.S.A. § 7552.

*Damages*

The assessment of damages is within the sole province of the factfinder. *McCain Foods, Inc. v. Gervais,* 657 A.2d 782, 783 (Me.1995); *Dillingham v. Ryan,* 651 A.2d 833, 837 (Me.1994). On appeal, a damage award will be disturbed only if there is no competent evidence in the record supporting the award. *McCain Foods,* 657 A.2d at 783 (citation omitted). A plaintiff must prove the amount of the damages with positive facts or with evidence from which their existence and amount may be determined to a probability. *Dillingham,* 651 A.2d at 837 (citation omitted).

The Gliddens contend that Stevan Belden's testimony about the diminution in value of his property resulting from the work of the Gliddens on the Woods Road provided an inadequate basis for a damage award. Stevan testified that, in his opinion, the work done by the Gliddens diminished the value of his property by about $10,000. In addition, photographs of the work done by the Gliddens were submitted as exhibits. The court awarded the Beldens $6,000 in damages.

A property owner may testify about the value of and damage to his property. *See Nyzio v. Vaillancourt,* 382 A.2d 856, 861 (Me.1978) (upholding a damage award in a trespass case of $2,500 based solely on property owner's estimate of the value of the cut trees); *Levasseur v. Field,* 332 A.2d 765, 769 (Me.1975) (upholding a damage award based on boat owner's opinion as to the fair market value of the boat at the time of accident). Stevan's testimony that the work done on the Woods Road damaged his property in the amount of $10,000, deemed credible in part by the court, satisfied the Beldens' burden of proof. *See Titcomb v. Saco Mobile Home Sales,* 544 A.2d 754, 758 (Me.1988) (a wronged party need not prove his damages to a mathematical certainty).

*Attorney fees and "costs of litigation"*

The Gliddens contend that the court erred in awarding the Beldens attorney fees

in the amount of $6,074.25, the total amount billed by the Beldens' attorney through the start of the trial.[25] In particular, the Gliddens contend that the award for the total amount of attorney fees incurred by the Beldens was an abuse of discretion because, pursuant to 14 M.R.S.A. § 7552, an award of attorney fees should reflect only that portion of the total fee that is linked to the claim brought under the statute. Although this argument might have merit if the court had awarded attorney fees in the amount of $6,074.25, it awarded the Beldens attorney fees in the amount of only $3,000. Given the importance at the trial of the issues of trespass and a right of way over the Woods Road, the court's determination that $3,000 out of a total of almost $8,000 was attributable to the section 7552 claim was not erroneous.

In addition to allowing a prevailing party to recover attorney fees if the trespass was committed knowingly or willfully, 14 M.R.S.A. § 7552 permits a prevailing party to recover the cost of any professional services necessary for the determination of damages and other court costs.[26] The Gliddens contend that if, by awarding the Beldens "the costs of this litigation," the court awarded them the costs of retaining the Beldens' surveyor, Edward Coffin, that was error. Specifically, they contend that Coffin was hired by the Beldens only to research ownership of the Rangeway, and he contributed nothing to the resolution of the Woods Road controversy. The defendants assert only that the court did not err in awarding them a portion of their costs and do not address whether "costs of this litigation" was intended to include surveyor fees.

We conclude that the court's award of "costs of this litigation" to the Beldens included only "court costs" as provided for in the trespass statute. The court's order quotes the section of the statute that sets forth the remedial options. The court was

---

**25.** The Beldens' attorney estimated that there was approximately $1,800 worth of trial preparation work that he had not yet billed at the start of the trial.

**26.** *See* text of statute at note 23.

aware of the option of awarding the cost of "professional services" including surveyor fees and it decided not to award such costs. We must assume, in the absence of a request for findings on that issue, that the court found for the Gliddens on all factual issues necessarily involved in that decision. The determination that the surveying services of Coffin Engineering were unnecessary to the determination of the trespass damages is not clearly erroneous. *See Blackmer,* 437 A.2d at 861.

The entry is:

The portions of the judgment relating to the ownership of the Rangeway and the damages for the trespass on the Rangeway are vacated. The judgment is otherwise affirmed.

All concurring.