2000 ME 176

**Lisle A. EATON et al.**

v.

**TOWN OF WELLS et al.**

Supreme Judicial Court of Maine.

Argued Sept. 6, 2000.
Decided Oct. 20, 2000.

Robert M.A. Nadeau (orally), Amy B. McGarry, Nanette M. Ardry, Nadeau McGarry & Smith, P.A., Sanford, for plaintiffs.

Durward W. Parkinson (orally), Susan Bernstein Driscoll, Michael W. MacLeod–Ball, Bergen & Pakinson, LLC, Kennebunk, John J. Wall III, Thomas F. Monaghan, Monaghan, Leahy, Hochadel & Libby, LLP, Portland, Andrew Ketterer, Attorney General, Paul Stern, Dep. Attorney General (orally), Augusta, for defendants.

Panel: WATHEN, C.J., and CLIFFORD, RUDMAN, SAUFLEY, ALEXANDER, and CALKINS, JJ.

WATHEN, C.J.

[¶ 1] Lisle A. Eaton, Alice M. Eaton, and Priscilla Jane Eldridge (the Eatons) appeal from a judgment entered in the Superior Court (York County, *Kravchuk, C.J.*) after a non-jury trial granting the public and the Town of Wells an easement over a portion of Wells Beach and from the court's order clarifying its final judgment.[1] The Town cross-appeals from the judgment declaring record title in the Eatons and denying its claim for adverse possession and from the summary judgment denying its claim of title to said property. Finding no error, we affirm the judgment.

## I.  Background

[¶ 2] On December 31, 1997, Lisle A. Eaton, individually and as attorney-in-fact for his siblings, Donald H. Eaton, Jr. and Priscilla Jane Eldridge, filed a complaint against the Town of Wells, the Town selectmen, and all users of plaintiffs' property and all persons unascertained, not in being, or unknown claiming under such users. The complaint was amended to add and dismiss claims and to dismiss and redesignate parties. As amended, it identified plaintiffs as Lisle A. Eaton, individually and attorney-in fact for Priscilla Jane Eldridge, and Alice M. Eaton; defendant as the Town of Wells; and the remaining claims as a quiet title action at law and a quiet title action in equity.[2]

---

1. The Eatons also appeal from the court's order denying summary judgment in their favor on their complaint and the Town's counterclaim. We need not be address these issues because the court considered the claims on the merits at an evidentiary trial. *See Monopoly, Inc. v. Aldrich,* 683 A.2d 506, 510 (Me.1996); *Bigney v. Blanchard,* 430 A.2d 839, 842–43 (Me.1981).

2. The Eatons' argument that the court's grant of easements by prescription constituted an unconstitutional taking is not addressed because the Eatons voluntarily dismissed their count relating to constitutional claims. Therefore, the argument is not preserved for appellate review. *See O'Halloran v. Oechslie,* 402 A.2d 67, 69 n. 1 (Me.1979).

[¶ 3] The Town filed an answer and counterclaim, which included claims for declaratory judgment—fee simple; adverse possession; title by acquiescence; declaratory judgment—easement; easement by prescription; dedication and acceptance; implied easement; and offset taxes. The State of Maine was allowed to intervene and filed an answer raising as an affirmative defense the public trust rights in the intertidal zone to encompass walking and other recreational and amusement activities, in addition to fishing, fowling, and navigation.

[¶ 4] During the pendency of the action, the Town filed a motion for preliminary injunction to authorize the Army Corps of Engineers access on and across the 2200 linear feet of sand beach in dispute for the purpose of laying pipeline and incidental construction in connection with the Wells Harbor Federal Navigation Project. It later requested the court's consent to withdraw its motion for a preliminary injunction, and the Eatons filed a motion for sanctions and attorney fees in relation to the motion. The court deferred action on the motion until the trial.

[¶ 5] Both sides filed motions for summary judgment and the court entered judgment denying the Town's motion as to the Eatons' complaint because of issues of material fact as to the Eatons' record title to the property; granting the Eatons' motion as to the counts of the Town's counterclaim involving the Town's record title and tax offsets; and denying the Eatons' motion as to the remaining counts of the Town's counterclaim.

[¶ 6] The court held a bifurcated trial to first address the Eatons' claim of record title; and, second, if the Eatons prevailed, to address the Town's equitable use claims. On the first part of the bifurcated trial, the court found that the Eatons are the record title owners of any residual land not conveyed from the parcel of land originally purchased by William Eaton in 1892 and shown on the plans of the Wells Beach Improvement Company. On the second part of the bifurcated trial, the court found, *inter alia*, that the Town established the public's right to use "Wells Beach" both on the dry sand and the intertidal zone for general recreational purposes, including but not limited to bathing, sunbathing, picnicking and walking, through an easement by prescription and, in the alternative, through dedication and acceptance. The Town also established the Town's right to use the beach through a prescriptive easement for purposes associated with beach maintenance and preservation including raking, litter control, maintaining wildlife habitats, and seasonal lifeguard stands, but did not prove it has a right to install pipe over the subject parcel to aid in its harbor dredging project and did not prove title to the beach by adverse possession. The judgment also ordered the Town to pay the Eatons' costs but not attorney fees in connection with the Eatons' motion for sanctions and attorney fees relating to the Town's motion for preliminary injunction. The court then entered a final judgment based on the prior decisions in the bifurcated trial.

[¶ 7] The Eatons filed a motion for proposed findings of facts and conclusions of law that the court denied. The Eatons appealed and the Town cross-appealed. Thereafter, the Town filed a motion to suspend M.R. Civ. P. 73(f) to allow the Superior Court to act on a motion to clarify its judgment, which we granted. The court entered an order clarifying that its final judgment and all other orders in this case did not establish the boundaries of the house lots that abut the concrete seawall to the west of the subject sand beach. The Eatons appealed this order as well, and the appeals were consolidated.

[¶ 8] A general overview of the relevant facts may be summarized as follows: The case involves title to and equitable use of a certain portion of Wells Beach. The Eatons' great grandfather, William Eaton, acquired approximately 40 acres on the peninsula containing Wells Beach in 1892 from Samuel Littlefield, Augustus Littlefield

and George Chaney. The peninsula is bounded on the east by the Atlantic Ocean, on the west by Webhannet River, on the north by the mouth of the Webhannet River, and on the south by land of another. With others, William Eaton formed the Wells Beach Improvement Co. and developed the peninsula initially with 300 lots, situated on both sides of Atlantic Avenue, a road running through the development and parallel with the ocean. For purposes of the easement, focus was on the portion of Wells Beach extending over one mile in length between Mile Road (a/k/a the casino area) to the south and the jetty (a/k/a Wells Harbor or the mouth of the Webhannet River) to the north.

[¶ 9] Through the years, William Eaton's portion of the peninsula development was reduced to certain lots on the westerly side of Atlantic Avenue and the 44 lots on the easterly side of Atlantic Avenue within the portion between the Mile Road and the jetty. The individual lots were sold, and the subject premises is the remaining strip of sand beach easterly of the 44 lots beginning approximately 3000 feet to the north of the Mile Road and encompassing 2200 linear feet of sand, which is not contiguous because certain lots in the development were sold with the land extending to the Atlantic Ocean. During and after William Eaton's development of the property, the public used the beach, both the dry sand portion and the intertidal portion, for sunbathing, walking, and other recreational purposes, and the Town maintained the beach.

## II. Record Title

### A. Town's title

[¶ 10] The Town argued that the court erred in granting the Eatons' motion for summary judgment dismissing the Town's claim of record title to the subject premises. We review the Superior Court's "entry of summary judgment for errors of law, viewing the evidence in the light most favorable to the party against whom the judgment was entered." *Rodrigue v. Ro-*

*drigue*, 1997 ME 99, ¶ 8, 694 A.2d 924, 926 (citation omitted). Summary judgment will be upheld if the evidence produced demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See id.* (citation omitted).

[¶ 11] The Town argued in its counterclaim that it holds record title to the subject premises through two sources. First, it contends that in 1643, Thomas Gorges, acting as agent for Lord Proprietor of Maine Sir Ferdinando Gorges, granted John Wheelright, Henry Boade, and Edward Rishworth

> full and absolute power to allott, bound and sett forth any lotts or bounds vnto any man that shall come to inhabitt in their Plantacon.... the bounds of the said Plantacon to begin from the northeast side of Oegungig Riuer vnto the southwest side of Kinnibuncke and to runne eight miles vp into the countrey
> ....

The Town argues that Wheelwright, Boade and Rishworth were the original proprietors of the Town of Wells and received the grant in that capacity. They argue that "as the feudal concept of property ownership gave way to fee ownership, this grant of authority ... had the effect of conveying fee title to the land described to the Town of Wells."

[¶ 12] Viewing the evidence in the light most favorable to the Town and assuming for purposes of summary judgment that Messrs. Wheelright, Boade, and Rishworth were the original proprietors and that proprietors obtained both "the right of soil" as well as jurisdiction, *see Montgomery v. Ives*, 21 Miss. 161 (13 Smedes & Marshall 161) (Err. & App.1849) (stating that whereas in royal provinces, the crown retained both the right of soil and jurisdiction, in the proprietary governments, the proprietors acquired the right of soil, as well as jurisdiction, from a grant), the trial court correctly concluded that based on those facts the Town as a matter of law did

not prove its title because the proprietors did not convey any interest to the Town by deed. *See Howard v. Hutchinson*, 10 Me. 335 (1833), *cited in Glidden v. Belden*, 684 A.2d 1306 (Me.1996).

[¶ 13] Both *Howard*, involving a pre-revolutionary grant, and *Glidden*, involving a post-revolutionary re-write of a grant, involved the issue of who owned the rights in rangeways. *Howard* was a trespass action brought against the surveyor for the Town of Sidney for cutting down and carrying away trees from a rangeway. *See Howard*, 10 Me. at 336. The Kennebec Proprietors in 1761 had laid out the tract of land now situated within the limits of the Town of Sidney and divided it into lots. *See id.* at 347. The plan represented three ranges with vacant spaces reserved between the ranges called rangeways. *See id.* The Court concluded with respect to the Town's rights in the rangeways arising out of the original laying out, division, and sale of lots as follows: "Whatever rights might have been acquired by the owners of adjoining lots, it is clear that the town of Sidney acquired no right of soil in these reservations. The fee either remained in the original proprietors, or passed with the grant of the lots adjoining." *Id.* In *Glidden*, a more recent case, we were also dealing with who owned the rangeways in a plan laid out by the Kennebec Proprietors in the Town of China. *See Glidden*, 684 A.2d at 1309–10. Citing the above quoted language in *Howard*, we stated that the Court in *Howard* "also held that ownership of the rangeways remains with the Proprietors unless they *expressly* convey their interest therein or the public-at-large acquires an easement over them by the laying out of a road by the municipality pursuant to the enabling statute or by user." *Id.* at 1313 (emphasis added).

[¶ 14] The Town argues *Howard* is distinguishable from and thus not instructive in this case. In this case Wheelright, Boade and Rishworth were the original proprietors obtaining their grant directly from Thomas Gorges, the Deputy Governor of the Province of Maine. In *Howard* and *Glidden*, the Kennebec Proprietors derived their interest not from the Governor of the Province of Maine, but through a deed from the heirs of Boston merchants who owned the premises. *See Glidden v. Belden*, 684 A.2d 1306, 1309 n .1 (Me.1996) (citing RONALD F. BANKS, MAINE BECOMES A STATE 47 (1970)). The Boston merchants acquired the property when the grant was sold to them by William Bradford and a group of pilgrims, who were granted the premises in 1629 by the Council for New England. *See* RONALD F. BANKS, MAINE BECOMES A STATE 47 (1970).[3] The Town contends that in *Howard* the court did not discuss the capacity of the proprietors and their relationship to the Town of Sidney whereas in this case the Town "presented facts that explained the means by which the land granted to proprietors came to be held by the Town in fee." The only "fact" they present, however, is that their expert witness stated in an affidavit that "[a]s the feudal concept of property ownership gave way to fee ownership, this grant of authority from Thomas Gorges to Messrs. Wheelright, Boade and Rishworth had the effect of conveying fee title to the land described to the Town of Wells." This statement, however, is an assertion of law for which the Town offered no legal au-

---

**3.** The Kennebec Proprietors owned lands which now encompass Vassalboro (from which Sidney came) and China (formerly Harlem). In 1771, Vassalboro became a town pursuant to the Acts and Resolves of the Province of Massachusetts Bay. *See* ALMA PIERCE ROBBINS, THE HISTORY OF VASSALBOROUGH, MAINE 13 (1971). In 1792 Sidney, formerly part of the Town of Vassalboro, was incorporated as a town. *See* TOWN OF SIDNEY, EXCERPT FROM KINGSBURY'S HISTORY OF KENNEBEC COUNTY (1892). In 1796, Jones Plantation was incorporated as a town named Harlem, which later became China, pursuant to an act of the Massachusetts legislature approved by the governor in 1796. *See* MARION T. VAN STRIEN, CHINA, MAINE: BICENTENNIAL HISTORY 3, 14 (1975). The Kennebec Proprietors dissolved between 1815 and 1822, in part because towns were being incorporated. GORDON E. KERSHAW, THE KENNEBECK PROPRIETORS 1749–1775 at 285, 293–95 (1975).

thority. Nor did it offer any underlying factual basis to support the bald and conclusory statement by its expert.

[¶ 15] Contrary to this legal conclusion, historical sources reveal the following: The Kennebec Proprietors "are not to be compared with the mere proprietors of New England townships, although their powers and rights before the law were substantially the same." GORDON E. KERSHAW, THE KENNEBECK PROPRIETORS 1749–1775 at xiv (1975). Proprietors of New England towns have been defined as:

> the original grantees or purchasers of a tract of land, usually a township, which they and their heirs, assigns, or successors, together with those whom they chose to admit to their number, held in common ownership. They enjoyed the absolute ownership and exclusive control over such tract or tracts of land granted to them and were responsible collectively for the improvement of the new plantation. More specifically, they were responsible for inducing and enlisting settlers and new comers, for locating home lots and dwelling houses, for building highways and streets . . . . In other words, they constituted the nucleus of the newly settled community and at first they controlled the whole machinery of the town's life, both political and economic.

ROY H. AKAGI, PH.D., THE TOWN PROPRIETORS OF THE NEW ENGLAND COLONIES at 3 (1924). Although seventeenth century proprietors and eighteenth century proprietors differed, even in the seventeenth century, "there was already some differentiation between the territorial and the political jurisdiction of the town[,] and the proprietors alone claimed the former function." *Id.* at 289; *see also id.* at 12, 20–21, 33, 46. "From the beginning it was the proprietors, not the town, who had the complete jurisdiction over the town lands." *Id.* at 289.

[¶ 16] Further, as used above, the proprietors of a "town" also changed. In Wells, the original proprietors were the above-mentioned John Wheelright, Henry Boade and Edward Rishworth of Wells. *See* EDWARD E. BOURNE, LL.D., THE HISTORY OF WELLS AND KENNEBUNK at 10 (1875) [HISTORY OF WELLS]. Thereafter, however, Massachusetts took control and on July 5, 1653, granted to the Town of Wells corporate powers, providing, *inter alia,* that Wells shall be a township, every inhabitant shall "enjoy all theire just propaietyes, titles, and intersts in the howses and lands which they doe possess, whither by graunt of the toune possession, or of the former Genneral Courts," and "all the present inhabitants of Wells shall be freemen." *Id.* at 32. Once the Town was incorporated, the ownership and control of the common lands went through a period of uncertainty. Bourne reported:

> [O]n the 20th of March, 1715–16, [those who had taken up their residence] voted themselves to be owners in common of all the ungranted land. . . . This vote was the introduction of the proprietary of the town, and from this period they and their heirs or grantees assumed the title of the soil, and made grants according to their pleasure. To manage safely and judiciously their interests in the township, it was necessary that a proper organization should be effected, and on the 14th of May following, a meeting of the proprietors was called. . . . Thus the town, as such, was divested of all control of the lands from this date, and all legislation in regard to them and all grants were thenceforth at the will of the proprietors.

HISTORY OF WELLS at 652–53. After years of laying out lands and making grants, the proprietors voted to divide the land and assign it by lottery to the persons owning legal rights in the common, and on February 1, 1773, with 112 proprietors, a proprietors' meeting was held for the purpose of drawing the lottery. *See id.* at 656–58. A small amount of land still remained in the proprietors, another committee was formed to divide the "commons," and in 1812 it was voted that " 'the committee for

**240**

dividing the commons, be directed to cause all the lands already surveyed to be divided into lots, and to prepare for drawing the same.' " *Id.* at 660. Bourne noted, however, that "[t]hese instructions do not appear to be have been complied with.... [T]he few little ungranted tracts of land remaining in the different parts of the town are either tenantless, or have been taken up by some persons who have thought it best not to permit them to run to waste." *Id.*

[¶ 17] Therefore, even though the proprietors that eventually led to the Town of Wells were closer to the royal grant than the Kennebec Proprietors, the factual distinction does not affect the law concerning the ownership of the remaining land. As with the Kennebec Proprietors and the Towns of Sidney and China, the Wells proprietors were empowered to divide and allot the lands, but it was Massachusetts that controlled the incorporation of the Town of Wells. Also, as can be seen by subsequent town history, there was always a question of who owned the remaining land and the townspeople years after the town was established voted to take control of the common land. Thus, the Town's argument that title passed when the feudal concept evolved into a fee system of ownership is neither consistent with our case law nor supported by the history of proprietors in the colonies in general or the town history in particular. Thus, the trial court was correct that as a matter of law the Town, without an express grant from the proprietors, derived no title.

[¶ 18] Second, the Town contends that in 1720 the Town received a deed from Symond Epps, in behalf of himself, and Daniel Epps, administrators of Major Daniel Epps, deceased, and also in behalf of John Wadleigh through a letter of attorney, conveying all their interest received in deed to John Wadleigh from Thomas Chabinock Nampscossah. Thomas Chabinock was the sagamore (leader) of the native people in that area, and in 1649 devised to John Wadleigh "all that the sd Sagamores

Lands, with his whoole right Title & Interest, Called by the name of Nampscoscocke, bounding betweene Noguncoth [later known as Oqunquit] & Kenebunke [Rivers], & vp as hy as Cape Porpus falls. ..." Likewise, the trial court looked to the above-referenced 1715–16 town meeting and "conclude[d] that as a matter of law the interest which the Town of Wells obtained in 1720 under these instruments was not intended to be nor was it a fee interest in the land described by the instruments." As the trial court noted, by 1720, significant portions of the Town were already owned by individuals, which the Town acknowledged, and thus the intent of the parties to the deed could not have been to convey to the Town the same properties. *See Calthorpe v. Abrahamson,* 441 A.2d 284, 286 (Me.1982) (stating that the court in interpreting the language of deed, which is a question of law, seeks to ascertain the intention of the parties to the deed). Therefore, the court did not err in concluding as a matter of law that the 1720 deed did not transfer title to the Town.

### B. Eatons' title

[¶ 19] The Town contends that none of the deeds or devises into the predecessors of William Eaton conveyed a 40–acre parcel near the subject parcel. They correctly contend that a person can convey only what is conveyed into them. *See Calthorpe v. Abrahamson,* 441 A.2d 284, 287 (Me.1982). Construction of the language of a deed, however, is a question of law. *See id.* at 286. The existence and nature of particular boundaries is a question of law and the location of those boundaries is a question of fact. *See Tallwood Land & Dev. Co. v. Botka,* 352 A.2d 753, 755 (Me.1976).

[¶ 20] There is no dispute concerning the chain of title beginning with the deeds into William Eaton in 1891 and 1892 up to the plaintiffs. In 1891 Augustus T. Littlefield and George Chaney conveyed to William Eaton:

three undivided eighths parts of a certain lot of salt marsh and beach hommocks situate in said Wells at Wells beach bounded in the whole thus—Beginning at Marsh of the grantee and by Town River—thence Easterly by said River to the Atlantic Ocean—thence Southwesterly by the Ocean to Grantee's land—thence Northwesterly by Grantee's land to the place of beginning, *containing forty acres more or less....*

(emphasis added). In 1892 Samuel S. Littlefield conveyed the remaining ⅝ interest in the same property. No other deeds or written documents used this description. Instead, the court based its findings concerning the source of title into Augustus Littlefield, George Chaney, and Samuel Littlefield on deeds and probate records with more generalized descriptions, through the assistance of the genealogical studies of Fred Boyle.

■ [¶ 21] Mr. Boyle, a professional genealogist, traced the ownership to the subject premises through the ancestors of Samuel Littlefield's grandmother and Augustus Littlefield's great-grandmother, Elizabeth Storer Littlefield, beginning with a deed in 1645 from the proprietors John Wheelwright, Henry Boade, and Edward Rishworth to Ezekial Knights. Ezekial Knights, Jr., with the consent of his father Ezekial Knights, conveyed property to Samuel Storer in 1674 as follows:

a Certen Tract of Prcell of *sault Marsh,* or Meddow Land, lijing & being between that part of the Webbhannet River Called the fishing Hoole, & the sea Wall, being a Certen Gurnet or Nose of Land compassed about with water, It lijing vpon the sayd River, on the Southermost side there of, abutting vpon the sea Wall contayneing the quantity of about *seauen or 8 Acers* bee It more or less, *with a Certen skirt of* vpland *or sea*

*Wall,* wch lyeth Adioyneing thervnto, where wee vsed to set our hay . . .

(emphasis added). Lydia Storer, as widow and administratrix of the estate of Samuel Storer, conveyed to Samuel Storer's brother, Joseph Storer, and later, together with her children and their spouses, re-conveyed to Joseph Storer's son, John Storer, the following property:

a Certain Island of *Salt marsh* lying on the South east side of the River of wells aforesaid formerly Known by the name of Knights Island and *also a point of upland Joyning to Said Marsh* bounded by the sea wall on the southeast Togeather with all the Rights Comon Rights Priviledges and appurtinancis whatsoever thereof and there to any wais belonging or may hereafter belong by any Manner of ways or means whatsoever or howeoever *all which Land and Marsh did formerly belong to Samvel Storer* Decea who was husband to Lydia Storer aboves....

(emphasis added).

[¶ 22] Joseph Storer conveyed his interest in his homestead, "[t]ogether with all the salt marsh and Thatch banks Joyning thereto . . . between the Homestead and the Sea" in 1720 to his son John Storer. John Storer died intestate and his estate was divided into specific properties for each child. Elizabeth Storer Littlefield, his daughter, acquired among other property "3 a of salt marsh in Wells called Trot's Island + 2 a of salt marsh in Wells called the Lower Hawk." Elizabeth Storer Littlefield was married to Jonathan Littlefield, who predeceased her,[4] and was the mother of Jonathan Littlefield, John Storer Littlefield, Samuel Littlefield, Clement Littlefield, and Elizabeth Littlefield. Elizabeth Storer Littlefield died in 1823 and her four sons acquired ¼ interests in her property.

---

4. There were three Jonathan Littlefields, and Mr. Boyle distinguished them as follows: The husband of Elizabeth Storer Littlefield was Jonathan 1. The brother of Samuel Storer Littlefield and Clement Littlefield was Jonathan II, and the son of Clement Littlefield was Jonathan III.

[¶ 23] In 1821, Samuel Littlefield conveyed his interest to his brothers John Storer Littlefield and Clement Littlefield, so that John and Clement then had ⅜ interests each. John Storer Littlefield through his will conveyed his ⅜ interest to his son, Samuel Storer Littlefield. Samuel also acquired his uncle Jonathan Littlefield [II]'s ¼ share through a deed giving Samuel his ⅝ interest.

[¶ 24] Augustus T. Littlefield and George Chaney acquired the other ⅜ interest as follows: Clement Littlefield, Augustus's grandfather, by deed dated November, 1831, conveyed to his son Jonathan Littlefield [III]:

> one undivided moiety or half part of my home farm whereon I now dwell, lying in Wells aforesaid, being one-half part of all my share or interest in the *real estate of my honored father, Jonathan Littlefield [I], late of said Wells deceased, now in my possession, consisting of upland and salt marsh,* according to the reputed boundaries thereof. . . .

(emphasis added.) He conveyed the other one half to his son Storer Littlefield. Jonathan Littlefield [III] conveyed his interest to his son, Augustus T. Littlefield. Storer Littlefield conveyed his interest to his son Joseph Littlefield, who conveyed it to George Chaney.

[¶ 25] The trial court concluded that the language in the deed from Ezekial Knights to Samuel Storer in 1674 fairly described the 40-acre parcel as ultimately conveyed to William Eaton in 1892. "In interpreting a deed, 'a court should give words their general and ordinary meaning to see if they create any ambiguity.'" *Sylvan Properties Co. v. State Planning Office,* 1998 ME 106, ¶ 8, 711 A.2d 138, 140 (citation omitted). "Examination of extrinsic evidence surrounding execution of a deed is only proper when the language of the deed is ambiguous and the intention of the parties is in doubt." *Id.* "In the absence of extrinsic evidence, the intent of the parties should be ascertained by resort to the rules of construction of deeds, such

as the familiar rule that boundaries are established in descending order of control by monuments, courses, distances and quantity." *Snyder v. Haagen,* 679 A.2d 510, 513 (Me.1996). We find that the court's interpretation that the language in the Knights to Storer deed described the 40-acre parcel, both as to location and size, is sound, reasonable, and consistent with the extrinsic evidence and the rules of construction. In particular, we find that the court's explanation of the seemingly inconsistent number of acres of the lot was proper:

> [T]he grammatical construction suggests that more than a seven or eight acre salt marsh is being conveyed because *there is also a skirt of upland or seawall.* The terms upland, seawall, and beach are used with some imprecision in all of these documents, but it is reasonable to conclude that in 1674 the language must have been used in reference to the land in front of the marsh (on the seaward side) running to the ocean or intertidal zone.

(Emphasis added.) Based on this rationale, the court correctly determined that even though the language in the deed from Knights to Storer referenced seven or eight acres of salt marsh, it conveyed forty acres because it included the skirt of upland, seawall and beach.

[¶ 26] Moreover, we find the same analysis applies to the other seemingly inconsistent acreage amounts. Although the description of Elizabeth Storer's share from her father of the two salt marsh parcels only totalled five acres and made no reference to the upland, as the Ezekial Knights deed did, the subsequent deed from her son Clement to his sons. referred to a salt marsh and upland. Thus it can be inferred that the salt marsh included the upland skirt as well. Therefore, the court did not err in its interpretation of the deeds and its conclusion that they conveyed the subject premises.

### III. Equitable Title by Adverse Possession

[¶ 27] The Town contends that the court erred in relying upon the emi-

nent domain takings in 1983 and 1989 to deny the Town's claim of title by adverse possession. The party seeking title by adverse possession must prove by a preponderance of the evidence "possession for a 20–year period that is actual, open, visible, notorious, hostile, under a claim of right, continuous, and exclusive." *Dowley v. Morency,* 1999 ME 137, ¶ 19, 737 A.2d 1061, 1068–69 (citing *Striefel v. Charles–Keyt–Leaman Partnership,* 1999 ME 111, ¶ 6, 733 A.2d 984, 989) (footnote omitted). "Adverse possession presents a mixed question of law and fact." *Striefel,* 1999 ME 111, ¶ 7, 733 A.2d at 989. " '[W]hat acts of dominion will result in creating title by adverse possession is a question of law.... Whether those acts were really done, and the circumstances under which they were done, raise questions of fact.' " *Id.* (citation omitted). " 'Even though the evidence could support an alternative factual finding, that alone does not compel reversal of the findings below when they are supported by competent evidence.' " *S.D. Warren Co. v. Vernon,* 1997 ME 161, ¶ 5, 697 A.2d 1280, 1282 (citation omitted).

[¶ 28] The court denied the Town's claim for adverse possession because the Town failed "to prove by a preponderance of the evidence that it has been in possession of the land 'under a claim of right.' " The claim of right must be an " 'intent to claim the land as [its] own, and not in recognition of or subordination to [the] record title owner.' " *Striefel v. Charles–Keyt–Leaman Partnership,* 1999 ME 111, ¶ 14, 733 A.2d 984, 991 (quoting Black's Law Dictionary 248 (6th ed.1990)). The court determined that the Town explicitly acknowledged the Eatons' record interest in this parcel through its actions in the 1983 and 1989 takings, which negated the Town's claim of right to the fee.

[¶ 29] The Town first argues that eminent domain takings cannot, as a matter of law, be construed as recognition of a subordinate interest, citing 23 M.R.S.A. § 3023 (1992) for the proposition that a municipality may take property through eminent domain if title is defective and contending that is what it did. The court found, however, that even though the Town argued this position at the time of the trial, the Town acknowledged at the time of the takings that the Eatons were the record owners. The Town as the party claiming adverse possession has the burden to prove each element of the claim by a preponderance of the evidence. The court found that the Town did not prove that a title defect was the basis for the takings in 1983 and 1989. The Town's intent was a finding of fact and we defer to the factfinder on issues of credibility, weight and significance of evidence. Neither the condemnation order in 1989 nor the letters sent to the Eatons cited a title defect or stated that the Town was reserving any claim of title to the property in question for said reason. Nor did the Town introduce any evidence of its intent during the 1983 takings. Although the court could have found that the Town used eminent domain proceedings because there was a defective title, the court need not have found that was the reason. Therefore, the court did not err in determining that the Town did not prove its claim of right on this basis.

[¶ 30] The Town argues next that the evidence, as seen in the court's findings, showed that the Town acquired title by adverse possession prior to the 1983 and 1989 takings and once the Town acquires title by adverse possession, it cannot be divested of that right. *See S.D. Warren Co. v. Vernon,* 1997 ME 161, ¶ 11, 697 A.2d 1280, 1283; Restatement (3d) of Property § 2.17 cmt. a at 261–62 ("[A] fee simple persists in the person to whom the estate is forfeited."); *see also Picken v. Richardson,* 146 Me. 29, 36, 77 A.2d 191, 194 (1950) *cited in Town of Sedgwick v. Butler,* 1998 ME 280, ¶ 6, 722 A.2d 357, 358 ("[T]he common law rule ... is that a perfect legal title cannot be lost by abandonment.").

[¶ 31] Even though the trial court's decision does not specifically state when adverse possession would have passed but for

the 1983 and 1989 actions, even if it had found that it would have ripened before the 1983 and 1989 takings,[5] it can be inferred from the court's findings that it found that the 1983 and 1989 takings were merely reflective of the Town's understanding of title even prior to 1983 and thus still negated the claim of right for purposes of adverse possession. Because this is a factual determination, we defer to the trial court's determination and find no error.

## IV. Equitable Use Interests

[¶ 32] The Eatons argue that the court erred in finding that the Town met its burden of proving an easement by prescription. The party asserting the easement must prove (1) continuous use (2) for at least 20 years (3) under a claim of right adverse to the owner, (4) with his knowledge and acquiescence, or (5) a use so open, notorious, visible, and uninterrupted that knowledge and acquiescence will be presumed. See S.D. Warren Co. v. Vernon, 1997 ME 161, ¶ 5, 697 A.2d 1280, 1282; Town of Manchester v. Augusta Country Club, 477 A.2d 1124, 1130 (Me. 1984). When the land is wild and uncultivated, Maine applies the rule that open and continuous use for the requisite length of time raises a rebuttable presumption that the use was permissive. See S.D. Warren Co., 1997 ME 161, ¶ 16, 697 A.2d at 1284; Town of Manchester, 477 A.2d at 1130. " 'The test of a public use is not the frequency of the use, or the number using the way, but its use by people who are not separable from the public generally.' " S.D. Warren Co., 1997 ME 161, ¶ 16, 697 A.2d at 1284 (citation omitted).

[¶ 33] The Eatons argue, inter alia, that the record was devoid of material evidence to support any of the elements and that the facts were similar to a previous, yet separate, case involving Moody Beach, in which another justice of the Superior Court rejected a finding of prescriptive easement. See Bell v. Town of Wells, 557 A.2d 168 (Me.1989). We review the trial court's factual findings in the present case as to the elements of a prescriptive easement for clear error and will affirm those findings if there is competent evidence in the record to support them even though the evidence could support alternative factual findings. See S.D. Warren Co. v. Vernon, 1997 ME 161, ¶ 5, 697 A.2d 1280, 1282. Although the trial court in the Moody Beach case may have reached a different conclusion based on the facts of that case, the trial court in this case is not bound by the trial court in another case. The determination is a factual issue and the court looks to the evidence presented in the case before it. Contrary to the Eatons' contention, the court had ample evidence in this case.

[¶ 34] The court made the following findings: Beginning with William Eaton's conduct and continuing through the plaintiffs' conduct in 1983 and 1989, the Eatons acquiesced, rather than gave permission, to the public's right to use Wells Beach for a broad range of recreational purposes, ranging from strolling to sunbathing, picnicking, and swimming and all other recreational beachfront activities both on the dry sand and the intertidal zone. There was no evidence that the public ever sought or obtained permission to use the beach for said purposes, and the public has treated the beach as its own for recreational purposes. The public use intensified in the 1960s when the Town built a jetty that extends out into the Webhannet River in front of Wells Harbor. At this point the public could access the beach from either the southern end at the end of

---

5. The court found for purposes of prescriptive easement that the Town's routine beach maintenance has continued since at least the 1960s. Therefore, title could have ripened between 1980 and 1989. Further, because the court said "at least" and found that the Town began its routine beach maintenance, i.e. cleaning the beach, hiring police officers and lifeguards, and advertising, in the 1950s and even before, title could have ripened in the 1970s or before as well.

Mile Road or from the northern end at the jetty. Unlike the users of Moody Beach, with the exception of the owners of the few oceanfront lots having ownership to the Atlantic Ocean, all of the users of Wells Beach, including the lot owners on the east and west side of Atlantic Avenue, were public users. Even after the 1983 and 1989 takings, the Town continued to perform beach maintenance, such as lifeguard stations, cleaning the beach, policing the beach, and protecting the piper plover population, an endangered bird species. Contrary to the Eatons' arguments, the court did distinguish between the upland portions of the Eatons' property and the intertidal portions and did recognize the 2200 feet as made up of separate noncontiguous parcels, but found acquiescence of a broad range of recreational purposes "both on the dry sand and in the intertidal zone" and all along the beach from the Mile Road to the jetty.

[¶ 35] The court had the testimony of Alberta Wentworth, Irene Brown, Hope Shelley, Robert Littlefield, and Edgar Moore, each testifying to the uses of the beach from the Mile Road to the jetty. Alberta Wentworth, a lifelong resident of Wells and 93 years old, testified that for as long as she could remember, the public has always been free to use the beach from the sea walls in front of the cottages to the low water mark. Irene Brown, age 76, born and raised on the Mile Road accessing Wells Beach, testified to her memories of the beach. She remembered playing on the beach from the time she was age four or five, through her teen years, from the 1920s to the 1940s. She also observed other people on the beach picnicking, having bonfires, and parties. She remembered the gypsies with ponies on the beach. She never saw anything preventing her from going on the whole length of the beach and has never sought permission to go onto the beach. She always treated it as a public beach.

[¶ 36] Hope Shelley, age 66, town historian, former curator of the Wells Beach Historical Society, and author of *Images of America: Beaches of Wells*, testified from research that since 1850, the public has always used the beach for recreational purposes, such as swimming, walking, playing ball, racing cars, landing airplanes, beach parties, and school picnics. By identifying landmarks, clothing, and postmarks, she was able to identify and explain numerous postcards collected by her for her book showing people using Wells Beach in the area of the subject premises in the early 1900s. She also testified from town records that as far back as 1901 the Town put out garbage pails for health concerns, that beginning in 1937 the Town hired a police officer to patrol the beach, that in 1938 the Town hired someone to clean the beach, and that with increased tourism in the twentieth century the Town increased its summer maintenance to include life-saving equipment and toilet facilities and also added advertising and regulatory activities.

[¶ 37] Robert Littlefield, age 81, former town manager, tax assessor, selectman and planning board member beginning in 1949, testified that Wells Beach is the lifeblood of the town. He had observed a lot of people on the beach when he was a child up to his teenage years. From 1950 to 1990, the Town had lifeguards and police for the beach, cleaned the beach, and had an advertising budget for the beach. The Town also regulated beach activity, such as posting signs prohibiting alcohol and requiring dogs to be on leashes. He neither personally nor on behalf of the Town ever saw any no trespass or private property signs on Wells Beach or ever sought permission to use the beach in 75 years. He always regarded it as a public beach. Edgar Moore, age 58, assistant road commissioner and a lifelong resident, testified that he has used the beach for recreational purposes since his childhood when he used to attend night parties, drag race on the beach, and walk up and down the beach. He also testified how the Town has maintained the beach.

[¶ 38] In addition, Lisle Eaton testified that he never posted no trespass signs or private property signs. He never gave the public permission to use the beach. Nor did he ever give the Town permission to put lifeguard stands, garbage cans on the beach or to otherwise maintain it. Further, he was aware that, since 1983 and 1989, the Town continued to maintain the beach.

[¶ 39] The Eatons also argue that, because they did not know they owned the property until 1983, they could not have acquiesced to the use. Because the court found that the public use was continuous for 100 years dating back to William Eaton's time, however, even if the court found that the plaintiffs did not know they owned the property until the 1980s, there was ample evidence that William Eaton knew of his ownership interest and acquiesced to the public use. Thus, the court could have found that a prescriptive easement had been established during that period. There was also evidence that the Town's use of the beach to maintain it went back to the early 1900s as well so that its prescriptive easement had also been established prior to the current Eatons' ownership.

[¶ 40] Finally, the Eatons argue that the court's finding that a claim of right for purposes of prescriptive easement existed is inconsistent with its other finding that no claim of right for purposes of adverse possession existed. The Eatons fail to recognize, however, that the claims are distinct. "[A]dverse possession concerns itself chiefly with the acquisition of a present possessory estate, that is, fee simple absolute ... Prescription, on the other hand, concerns itself wholly with the acquisition of *rights in* the land of another, such as easements." POWELL ON REAL PROPERTY § 91.01[3] (2000). The 1989 condemnation was for purposes of laying pipe and storing sand from dredging the harbor, a use separate and distinct from the use for recreational purposes and the use for maintaining the beach in terms of placing lifeguard stands, trash bins, etc. The 1983 taking for accessways involved the right of access, whereas the prescriptive easement in this case does not involve the right of access but the right to use the beach once there. Even if the Town's actions represented an acknowledgement that the Eatons are the owners of the beach, those actions did not mean that the public or the Town were asking permission to use the beach for recreational or maintenance purposes. Therefore, the court did not err in finding that the Town proved every element of a prescriptive easement. Because we affirm the court's judgment concerning the public's and the Town's right to use the property through prescriptive easement, we need not address the alternative theory of dedication.

[¶ 41] The Eatons also argue that, even if the court did not err in granting an easement, the scope of the easement, i.e., "for general recreational purposes," is overly broad and vague, does not reflect the evidence presented at trial, and overburdens the Eatons' property. The Eatons also challenge the scope of the Town's right to use the beach for maintenance purposes. Even if the Eatons had properly preserved this argument, their claim fails. The issue whether a property is overburdened is a question of fact. *See Gutcheon v. Becton*, 585 A.2d 818, 822 (Me.1991). "[T]he permissible uses of an easement acquired by prescription are necessarily defined by the use of the servient land during the prescriptive period." *Id. cited in S.D. Warren Co. v. Vernon*, 1997 ME 161, ¶ 13, 697 A.2d 1280, 1283. "When presented with an alleged overburdening of a prescriptive easement, the factfinder must balance the prior use of the right of way established during the prescriptive period against any later changes in the method of use that unreasonably or unforeseeably interfere with the enjoyment of the servient estate by its current owner." *Id.* Not all changes in the use, however, will result in a per se overburdening of a prescriptive easement "when the change does

not manifest itself in some greater independent burden on the servient estate." *Id.* As to the argument that the description of the easement is too broad, we also apply the test that "the scope of a prescriptive easement should be so limited as to prevent a clearly foreseeable overburdening." *Id.* at 823.

[¶ 42] Even if we look to the use during the prescriptive period, contrary to the Eatons' argument, the language "general recreational purposes" adequately reflects the uses during the prescriptive period and would not unreasonably or unforeseeably interfere with the enjoyment of the servient estate by its current owner. As the evidence above shows, the court had competent evidence to support the language. Although the court listed certain recreational activities as examples, those were not the only recreational uses given in the testimony. As to the Town's right to maintain the beach, all of the uses provided were ways the Town used the property during the prescriptive period. Further, even if maintaining the habitat of the piper plover was not a use for 20 years, the use does not manifest itself in some greater independent burden on the Eatons' property. Thus, the court's conclusions concerning the scope of the easement were not clearly erroneous.

## V. Remaining arguments

[¶ 43] The Eatons argue that the court erred in evidentiary rulings concerning Moody Beach, which beach was the subject of prior litigation. *See Bell v. Town of Wells,* 557 A.2d 168 (Me.1989). They argue that the court abused its discretion by its disparate treatment of the parties: allowing as relevant the Town's historical evidence of the use of other beaches in Wells, in Maine, and in New England but disallowing as irrelevant the Eatons' evidence of the acquisition, ownership, development and use of Moody Beach and other beaches in Maine.

[¶ 44] We review the trial court's rulings on admissibility of evidence for clear error or abuse of discretion. *See Moody v. Haymarket Assocs.,* 1999 ME 17, ¶ 4, 723 A.2d 874, 875. Contrary to the Eatons' arguments, because the issues in this case involve the ownership and use of Wells Beach, the court did not err in excluding as irrelevant the evidence of the ownership of beaches outside of the Town of Wells. Moreover, even if the court should also have excluded evidence of the use of other beaches, it was harmless because the court specifically noted in its judgment that it did not rely on that evidence for its decision. As for the exclusion of evidence concerning Moody Beach in particular, the court did not abuse its discretion in its ruling that it would allow counsel to argue from the findings in the Moody Beach trial court decision, but it would not compare the evidence presented in that case with the present case. As stated above, the court is not bound by trial court decisions in other cases.

[¶ 45] Further, the court did not abuse its discretion in finding that the Town had not acted in bad faith, *see Linscott v. Foy,* 1998 ME 206, ¶¶ 16, 17, 716 A.2d 1017, 1021, and accordingly in denying the Eatons' claim for attorney fees incurred in defense of the Town's motion for preliminary injunction. *See Chiappetta v. LeBlond,* 544 A.2d 759, 760 (Me.1988). Contrary to the Eatons' contention, the court found that the Town brought the request in anticipation of a dredging project and that the project's failure to be funded was through a series of circumstances beyond anyone's control. This finding was based on evidence that, although anticipated, Congress did not fund the project. Nor did the court abuse its discretion in refusing to grant the Eatons' motion for findings of fact. *See Sewall v. Saritvanich,* 1999 ME 46, ¶ 10, 726 A.2d 224, 226. The thoroughness of the findings of fact in the court's twenty-one-page decision provided a sufficient basis to in-

form the parties of the reasoning underlying the court's conclusion. *See id.*

[¶ 46] Nor were there any errors in the court's order clarifying that its final judgment did not establish the boundaries of the house lots that abut the concrete seawall to the west of the subject sand beach. We had authority to grant the Town's motion for suspension of appeal to the extent necessary to enable the Superior Court to hear and determine the Town's motion for clarification, pursuant to M.R. Civ. P. 73(f), and accordingly the Superior Court had authority to act pursuant to our order. The Eatons argue that the abutting landowners were named as defendants as part of the following class: "all users of Plaintiffs' Property other than persons claiming any right, title or interest by, through, or under an instrument recorded in the York County Registry of Deeds"; and "... all other persons unascertained, or not in being, or unknown, or out of the state, and all other persons whomsoever who may claim any right, title, interest, or estate, legal or equitable, by, through, or under such users of Plaintiffs' property." They argue that service by publication was proper because it would have been impossible to name every person using the beach and impractical to identify all current owners. They further argue that there has been no claim by the Town that any of those abutting owners were unaware of the suit and that they should be defaulted.

[¶ 47] Service in quiet title actions "shall be made as in other actions on all *supposed known claimants* residing either in the State or outside the State, and notice to *persons who are unascertained, not in being or unknown* shall be given by publication as in other actions where publication is required." 14 M.R.S.A. § 6653 (1980) (emphasis added). Contrary to the Eatons' contention, the owners of lots 1 through 44 abutting the "strip of sand beach" in question were identifiable and ascertainable. Therefore, in order to include them, they should have been specifically named in the complaint, and service

other than by publication should have been attempted.

[¶ 48] Accordingly, the Eatons' argument concerning whether the location of the boundaries of the Eatons' property in respect to the abutting landowners was addressed is irrelevant because the abutting lot owners were not included in the litigation. Moreover, even if they had been included, the emphasis was on the "strip of sand beach." While it is possible that there is sand beach west of the seawall, the court's finding that sand beach meant that beach to the east of the seawall was supported by competent evidence describing the beach "from low water mark to cement sea wall." Accordingly it was not clearly erroneous.

## VI. Public Trust Doctrine

[¶ 49] Because we affirm the trial court's decision that the public and the Town have an easement by prescription to use both the dry sand portion of the beach and the accompanying intertidal zone, we need not reach the State's contention that we expand the public trust doctrine established in *Bell v. Town of Wells,* 557 A.2d 168 (Me.1989).

The entry is:

Judgment affirmed.

SAUFLEY, J., concurring.

[¶ 50] I concur in the result and in the reasoning of the Court. I write separately, however, because I would overrule *Bell v. Town of Wells,* 557 A.2d 168 (Me.1989).

[¶ 51] By our unduly narrow judicial construction of the time-honored public trust doctrine, our holding in *Bell* restricted the public's right to peaceful enjoyment of one of this state's major resources, the intertidal zones. Pursuant to our holding in *Bell,* a citizen of the state may walk along a

beach carrying a fishing rod or a gun,[6] but may not walk along that same beach empty-handed or carrying a surfboard. This interpretation of the public trust doctrine is clearly flawed. As the dissent so eloquently summed up, "the public's right even to stroll upon the intertidal lands hangs by the slender thread of the shoreowners' consent." *Id.* at 192 (Wathen, J., dissenting). I would conclude that the analysis of the *Bell* dissent constitutes the correct interpretation of the scope of the public trust in intertidal zones, *see id.* at 187–89, and I would apply that analysis to the intertidal zone on the Eaton's property.

[¶ 52] Although principles of *stare decisis* must be considered in determining whether we should give deference to the holding in *Bell,* the length and expense of the trial that bring the parties before us today speak eloquently of the need to address this issue immediately. As long as the public's legally cognizable interest in the intertidal zones remains artificially constricted by the holding in *Bell,* each time that the public and a private landowner clash over the scope of allowed recreational use of intertidal zones, the resolution will be uncertain. If such disputes reach litigation, the public will be required to prove actual historic use of the intertidal zone at issue for "recreational" purposes. In each case, the landowner will be

forced to defend against the possibility of ever expanding prescriptive rights in the public. Moreover, such disputes are not likely to be rare. Maine has approximately 3480 miles (5600 kilometers) of coastline.[7] It is the longest coastline on the eastern seaboard of the United States.[8] The potential for multiple disputes, for continuing uncertainty, and for extensive litigation is obvious.

[¶ 53] Thus, we should acknowledge the problems created by our holding in *Bell* before landowners and the public are forced through years of uncertainty and unworkable restrictions founded upon a faulty legal analysis. Although it is the policy of the courts to abide by precedent and not to disturb a settled point, the doctrine of *stare decisis* does not require a "mechanical formula of adherence to the latest decision." *Adams v. Buffalo Forge Co.,* 443 A.2d 932, 935 (Me.1982) (citations omitted). Accordingly, in order to overturn *Bell,* the Court's "unease with the analysis undertaken in that case must outweigh the compelling policy of following judicial precedent." *Shaw v. Jendzejec,* 1998 ME 208, ¶ 8, 717 A.2d 367, 370.

[¶ 54] I would conclude that the judicial unease with the *Bell* analysis far outweighs the admittedly important policy of following precedent.[9] The rule in *Bell* is a re-

---

**6.** The carrying of a gun under these circumstances must be directly related to the activity of "fowling."

**7.** According to the Maine Department of Conservation's Maine Geological Survey,

> The coast of Maine has 5600 kilometers (3480 miles) of tidally-influenced shoreline and is the third longest in the United States. There are about 3500 islands included in the shoreline length. Mapping has estimated that about 2% of the coast (120 km or 75 miles) has beaches. About half of this distance is made up of sandy beaches and the other half is made up of coarser gravel and boulder beaches. The latter category is commonly pocket beaches, of which there are over 200 pocket barrier beaches that front coastal wetlands. Most large sandy beaches occur along the southern coast be-

tween Kittery and Cape Elizabeth, south of Portland. A few miles of sandy beaches also occur in midcoast Maine near the mouth of the Kennebec River.

Maine Department of Conservation, Maine Geological Survey, *at* http://www. state.me. us/doc/nrimc/ mgs/marine/ marine.htm.

**8.** 1995 ALMANAC 495 (48th ed.1995).

**9.** There are a number of guiding principles that are called into play when the Court is deciding whether *stare decisis* should be applied or avoided. A prior decision may be overruled when:

> (1) the court is convinced that the rule of the prior decision operates harshly, unjustly and erratically to produce, in its case-by-case application, results that are not consonant with prevailing, well-established con-

cent creation of our own interpretation of an ambiguous term. In essence, we determined that the public did not historically own a right that was analogous to "recreation" as addressed in the Public Trust In Intertidal Land Act.[10] The Legislature has not taken any action in response to the *Bell* holding, that is, it has not revised the Public Trust In Intertidal Land Act to narrowly define "recreation" in the same manner that the *Bell* holding does. Thus, it has left the matter open for judicial correction. Furthermore, because the *Bell* opinion was rendered only eleven years ago, overturning that rule "will not do violence to a long line of authority, nor will it interfere with the reliance interests of these or other litigants." *Adams*, 443 A.2d at 936.

[¶ 55] In summary, common sense and sound judicial policy dictate that our holding in *Bell* should be overruled now, in order to preclude continuing uncertainty, expense, and disputes. Because I would overrule *Bell*, I would conclude that the public trust doctrine applies to the intertidal zone at issue here and that the Town's prescriptive easement claim need only be addressed to the extent that it is asserted regarding the dry sand portion of the beach at issue.

ceptions of fundamental fairness and rationally-based justice, (2) that conviction is buttressed by more than the commitment of the individual justices to their mere personal policy preferences, that is, by the substantial erosion of the concepts and authorities upon which the former rule is founded and that erosion is exemplified by disapproval of those conceptions and authorities in the better-considered recent cases and in authoritative scholarly writings, (3) the former rule is the creation of the court itself in the legitimate performance of its function in filling the interstices of statutory language by interpretation and construction of vague, indefinite and generic statutory terms, (4) the Legislature has not, subsequent to the court's articulation of the former rule, established by its own definitive and legitimate pronouncement either specific acceptance, rejection or revision of the former rule as articulated by the court, and (5) the court can avoid the most severe impact of an overruling decision upon reliance interests that may have come into being during the existence of the former rule by creatively shaping the temporal effect of the new rule articulated by the holding of the overruling case.
*Shaw v. Jendzejec*, 1998 ME 208, ¶ 9, 717 A.2d 367, 371 (quoting *Myrick v. James*, 444 A.2d 987, 1000 (Me.1982)).

